UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

ex rel. ROBERT E. MANCHESTER et. al.,

                              PLAINTIFFS,

                    Case no. 1:16- - 10947 MLW


PURDUE PHARMA, L.P. et al.,

McKESSON CORPORATION,

CARDINAL HEALTH INC., and

AMERISOURCEBERGEN CORPORATION,

                              DEFENDANTS


## THIRD AMENDED COMPLAINT AND DEMAND
## FOR TRIAL BY JURY

    Qui Tam Plaintiff Robert E. Manchester, as Relator, brings this action on behalf of the

United States of America, the Commonwealth of Massachusetts, each other Co-Plaintiff

State [1] and on behalf of all "Local Government" intervenors under the federal False Claims

_____

1 There are 29 Co-Plaintiff States (including the District of Columbia) in this action, each of whom were identified as parties in the original complaint, filed in the action on May 25, 2016. The false claims statutes of each Co-Plaintiff have been deemed to comport with the requirements of 42 U.S.C. section 1396h. See paragraph10 infra. These states or district include: California (see Cal. Gov. Code section 12650 et seq.); Colorado (see Colo. Rev. Stat. section 25.5 —4 — 303.5 et seq.); Connecticut (Conn. Gen. Stat. Section 4 — 274); Delaware (Del. Code Ann. tit 6 section 1201 et seq.); Florida (Fla. Stat. Ann. section 68.081 et seq.); Georgia (Ga. Code Ann. section 23 — 3 — 120 et seq.); Hawaii (Haw. Rev. Stat. Ann. section 661 — 21 et seq.); Illinois (740 Ill. Comp. Stat. Ann. section 175/1 et seq.); Indiana (Ind. Code Ann. section 5 — 11 — 5.5 et seq.); Iowa (Iowa Code Ann. section 685.1 et seq.); Louisiana (La. Stat. Ann. section 46:437.1 et seq.); Maryland (Md. Code Ann. Health — Gen. section 2 — 501 et seq.);
Massachusetts (Mass. Gen. Laws Ann. ch. 12 section 5A et seq.); Michigan (Mich. Comp. Laws Ann. section 400.601 et seq.); Minnesota (Minn. Stat. Ann. section 15C.01 et seq.); Montana (Mont. Code Ann. section 17 —8 — 401 et

Act, 31 U.S.C. sections 3730 (c) (3) and 3732 (b) ("FFCA") and related False Claims Acts as enacted by each Co-Plaintiff State (See for example Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 section 5A et seq. ('MFCA") against Defendants Purdue Pharma, L.P., et. al. ("PURDUE"), McKesson Corporation ("McKESSON"), Cardinal Health Inc. ("CARDINAL") and AmerisourceBergen Corporation ("ABC") as manufacturers and/or distributors and vendors of the ORIGINAL FORMULATION Class Il opioid that was manufactured and sold in the United States and its territories by PURDUE PHARMA, L.P. during the years 1996 — 2010 (identified collectively as the "DEFENDANT DISTRIBUTORS").

## PRELIMINARY STATEMENT

PURDUE's original formulation of OxyContin triggered the onset of a national opioid epidemic and related health-care crisis. This epidemic began shortly after PURDUE began marketing and distributing its product in early 1996. It expanded in scope for more than a decade until PURDUE was able to replace that product with a revised formulation. This occurred about three years after the Company and several of its officers plead guilty to criminal misbranding.

---

seq.); Nevada (Nev. Rev. Stat. Ann. section 357.010 et seq.); New Jersey (N.J. Stat. Ann. section 2A:32C — 1 seq.); New Mexico (N.M. Stat. An. 27 — 14 — 1 et seq.); New York (N.Y. Fin. Law section 187 et seq.); North Carolina (N.C.
Gen. Stat. Ann. section 1 — 605 et seq.); Oklahoma (Okla. Stat. Ann. Tit. 63 section 5053 et seq.); Rhode Island (R.I. Gen. Laws An. section 9 — 1.1 — 1 et seq.); Tennessee (Tenn. Code Ann. section 4 — 18 — 101 et seq. and 71 — 5 — 181 et seq.); Texas (Tex. Hum. Rev. Code Ann. section 36.001 et seq.); Vermont (Vt. Stat. Ann. tit. 32 section 630 et seq.); Virginia (Va. Code Ann. section 8.01 — 216.1 et seq.); Washington (Wash. Rev. Code Ann. section 74:66.005 et seq.); and District of Columbia (D.C. Code Ann. section 2 — 381.01 et seq.).

2 See 32 U.S.C. section 3730 (b): Each Local Government Intervenor will assert standing to intervene in pending action pursuant to section 3730(b) and applicable state statutes of such intervenor's principal place of business.

In the 2007 plea bargain PURDUE struck with the United States Department of Justice, it admitted that it had marketed and promoted the ORIGINAL FORMULATION of its product

contrary to the limitations set forth in the labeling initially approved by the Federal Food and

Drug Administration ("FDA"). This plea bargain, for criminal misbranding (a felony conviction

in violation of 21 U.S.C.A. sections 331(a) and 333 (a) (2), constituted a fraud perpetrated upon

those physicians and patients who had relied upon the willful misrepresentations made

by PURDUE in violation of the labelling restrictions the FDA had imposed when it approved

PURUDE's new drug application ("NDA 20- 553") in 1995.

This plea bargain, however, did not address an entirely separate fraud that was entirely

unrelated to PURDUE's initial or subsequent labeling.

That fraud involved two separate but related acts on the part of each Defendant[1] that

involved a willful and knowing conspiracy to violate section 3729 (1) FFCA and section 5A

MFCA and related provisions of the false claims statutes of each other Co-Plaintiff State ("Co-

Plaintiff FCA Statutes").

First: Willful failure of PURDUE to Comply with Mandatory Reporting
Obligations of 21 CFR 314.80

PURDUE'S intentional failure to report to the FDA "any significant failure of

expected pharmaceutical action", a mandatory reporting obligation set forth in 21 CFR 314.80,

that PURDUE as manufacturer and "applicant"[2] of a pharmaceutical product was required to

---

[1] PURDUE as manufacturer and "applicant" of NDA 20 − 553 was required to comply with the mandatory reporting
requirements of 21 C.F.R. section 314.80 (a). In addition, as "registrant" of a Class II opioid pharmaceutical
product [definition includes all "manufacturers, distributors and dispensers" of controlled substances] PURDUE
was required to provide effective controls and procedures to guard against the theft or diversion [of such
products]. Cf.". Masters Pharm., Inc. v. DEA, 861 F. 3d 211-212 (D.C. Cir. 2017). See n. 5-6 supra. PURDUE and
the DEFENDANT DISTRIBUTORS, each as "registrant", were required as "distributors and dispensers" to act
immediately to report to "DEA all orders of unusual size, frequency or pattern ... that gave rise to the suspicion
that the customer was diverting controlled substances" (Masters Pharm. 963 F. 3d at 222- 223. See n. 6 infra.
[2] See n. 3 supra.

meet as a condition imposed by the FDA in its 1995 approval of NDA 20 — 553. (See 57 FR 17950, April 28, 1992 amendment to section 314.80[3] [1992 21 CFR 314.80]).

That fraud, perpetrated on the FDA, prevented its doctors and research scientists from carrying out their responsibility to evaluate whether the data contained in PURDUE'S adverse reaction reports and related materials demonstrated unexpected "frequency" of addiction and overdose complaints sufficient to warrant a post-market risk-benefit analysis of the product and possible suspension or restriction of further sales until that analysis could be performed and the continuing safety of the product could be determined[4].

Beginning in 2002, if not before, PURDUE had actual knowledge that its ORIGINAL FORMULATION was subject to wide-spread illicit diversion and abuse and that several hundred or more of its prescribing physicians were then acting recklessly and illegally prescribing the ORIGINAL FORMULATION for distribution to addicts or their suppliers ("Suspect Physicians").

Relator asserts that beginning in 2002 if not before PURDUE, intentionally and repeatedly violated 1992 21 CFR 314.80 once it "developed certain internal criteria" it used to

---

[3] In 1985 the FDA proposed certain "New Drug and Antibiotic Regulations" (see 50 FR 7452, date February 22, 1985). On April 28, 1992, section 314.80 of these regulations was revised, as follows: "FDA proposed several changes to 21 CFR 314.80 [including the following to Section 314.80(a)] ... under the existing regulation defined an "adverse drug experience," in part, as '(any significant failure of expected pharmaceutical action." The proposed rule would delete the adjective 'significant" from this definition and, as a result, require reporting of "any failure of expected pharmaceutical action." The proposed rule also would require applicants to review all adverse drug experience information "obtained or otherwise received by the applicant from any source, foreign or domestic," and to review periodically the frequency of reports of adverse drug experiences "that are both serious and expected ... and report any significant increase in frequency as soon as possible". This regulation was in force in December 1995 when PURDUE received approval from the FDA of NDA 20 — 553. See paragraph 14 infra.

[4] See, e.g., Mut. Pharm. Co. v. Bartlett, 133 S. Ct. 2466 (2013), n. 10: "see Government Accountability Office, Drug Safety: Improvement Needed in FDA's Postmarket Decision-making and Oversight Process 10 (GAO-06-402, *** 72] 2006 (noting that 10 drugs were voluntarily withdrawn by the manufacturer for safety reasons between 2002 and 2006); Wysowski & Swartz, Adverse Drug Event Surveillance and Drug Withdrawals in the United States, 1969 — 2002, 165 Archives Internal Med. 1363 (2005) (noting that more than 75 drugs and drug products were withdrawn from the market for safety reasons between 1969 and 2002).

create 'a ... confidential roster [of Suspect Physicians]". (See paragraphs 41.A — 41.C). During

such time PURDUE was required to comply with this regulation by the terms imposed by the

FDA in its approval of NDA 20-553. The regulation then in effect required PURDUE to report

"any failure of expected pharmacological action" to the FDA (See 57 FR 17950, eff. date April

28, 1992) and to "provide a complete picture of adverse drug experiences, rather than selected

reports that would improve the agency's ability to determine whether it should take

regulatory action". (Id. comment to section 314.80).

The term "significant failure", as used by the FDA, was intended to include

"manufacturing problems or batch problems" (See FDA Comment # 73, 50 FR 7452, eff. date

February 22, 1985). The term "Adverse drug experience" was defined by the FDA to mean: "Any

adverse event associated with the use of a drug in humans ... including ... an adverse event

occurring from <u>drug abuse</u> (emphasis added) [and] an adverse event occurring from drug

withdrawal". (See 1985 21 CFR 314.80 (a). In 1985 the FDA defined the term "serious" for the

purposes "of the final rule [to mean] an adverse drug experience that is life threatening ...

[including] ... overdose [that] is always to be considered serious." (Id., 50 FR 7452, Comment

71.c).

Notwithstanding such knowledge and related information, then contained in its

internal records, PURDUE failed to disclose that information to the FDA in willful violation of

1992 21 CFR 314.80 (reporting obligation required drug manufacturer to report all drug

overdoses, a type of "adverse drug reaction" deemed "serious" by the FDA) and "any failure

[specifically including "manufacturing problem"] of a drug product to produce its expected

pharmacological action". Additionally, PURDUE made the decision to continue to sell or

distribute its ORIGINAL FORMULATION to pharmacies for the purpose of filling prescriptions of

its Class II opioid product to medical doctors who it then knew were making "reckless" or "atypical" prescriptions to illicit drug users and their suppliers, and did so without making such knowledge known to any federal or state governmental agency, including but not limited to the FDA or DEA or any other federal or state governmental agency.

Further, PURDUE failed to disclose to the FDA the decision it had earlier made in 2002 to develop "a tablet that would be difficult to crush or syringe" and later efforts to purchase from its competitors within the pharmaceutical industry licensing rights that would enable PURDUE to incorporate in its product a suitable "controlled release-mechanism" that would have "the necessary physical structure and chemical composition ("hardness") required to prevent 'rampant abuse of the drug'". (See paragraph 15 infra). In 2002, if not before, PURDUE knew that its ORIGINAL FORMULATION lacked suitable hardness because its method of construction (involving wet granulation and direct compression methods; See paragraph 45 infra) was inadequate as a means to prevent "parenteral, nasal and/or oral abuse ... [of the product and its] abuse potential". (See paragraph 26 infra).

In 1995 PURDUE had represented to the FDA in NDA 20- 553 that the "[d]elayed absorption [of its ORIGINAL FORMULATION] is believed to reduce the abuse liability of a drug" (paragraph 22 infra) but did not provide the FDA with any clinical data that demonstrated that its ORIGINAL FORMULATION "was less addictive, less subject to abuse or other diversion, or less likely to cause tolerance and withdrawal than other medications" (paragraph 23 infra). The FDA accepted that representation and neither it nor PURDUE then considered" whether crushing of the ORIGINAL FORMULATION tablet would become wide-spread and lead to a high level of abuse once addicts and their suppliers became aware that the tablet was readily susceptible to crushing for purposes of illegal injection or snorting" (paragraph 25 infra).

6

Almost twelve years later when it pled guilty to criminal misbranding, PURDUE failed to disclose to the Department of Justice or the FDA or any other federal or state governmental agency that its INTERNAL SALES records, that it had begun to keep in 2002 or before, contained information from that PURDUE could identify "physicians suspected of recklessly prescribing to addicts or dealers". (See paragraph 41.A infra) ("Suspect Physicians"). Such failure constitutes a willful failure on the part of PURDUE to comply with the mandatory reporting obligations set forth in 21 CFR 314.80. Such failure was compounded by PURDUE's ongoing decisions, as follows; First, to continue to sell and distribute its ORIGINAL FORMULATION to its "Suspect Physicians" who PURDUE knew had written and were continuing to write prescriptions to abusers and their illicit suppliers; and, Second, to make related decisions not to comply with the mandatory reporting obligations set forth in both the 2007 Corporate Integrity Agreement between PURDUE and the Office of Inspector General (See paragraph 41. F infra) and the various Consent Judgments or Settlement Agreements PURDUE negotiated with a majority of states in 2007. (See paragraph 41.C infra for discussion of terms of Massachusetts Consent Judgment).

### Second: Willful Failure of Defendant Distributors to Comply with Mandatory Reporting Obligations of 21 C.F.R. 1301.7

McKESSON, CARDINAL and ABC as "registrants" [7] acted on behalf of PURDUE to distribute vast quantities of ORIGINAL OXYCONTIN during the years 1996 — 2010. During those years McKESSON, CARDINAL and ABC (the "DEFENDANT DISTRIBUTORS") undertook to distribute in interstate commerce the ORIGINAL OXYCONTIN product for purposes of sale to drug stores and pharmacies in all 50 US states and territories. Such distribution of a Class II opioid product was subject to and regulated by the 1970 Controlled Substances Act (21 U.S.C.

section 8801 et seq.) and the mandatory reporting obligations contained in that Act that required

each DEFENDANT DISTRIBUTOR as a "wholesale distributor" of controlled substances to register

with the U.S. Drug Enforcement Administration ("DEA") for approval as a "vendor" of controlled

substances under 21 C.F.R. sections 821 — 830 and "to report to [the] DEA all suspicious orders

for controlled substances and to take other precautions to ensure that

---

[7]

    See n. 3 supra n .9 infra.

[8]      The term "suspicious orders" is defined by 21 C.F.R. section 1307.71 (a) as "includ[ing] orders of an unusual size, pattern, or frequency" (Master's Pharm. supra, 861 F. 3d at 221. HN8). The court held that 21 CFR section 1301.74 "does not exhaustively list characteristics that might make a retail pharmacy's order for large quantities of controlled substances 'suspicious' (citation omitted) and cited with approval the DEA administrative decision in Southwood Pharmaceuticals, Inc.; Revocation of Registration, 72 FR 36487, dated July 3, 2007, at pp 36,487 and 36, 501-02 (internet pharmacy's orders were "suspicious because the pharmacy was buying an unusual mix of controlled and non-controlled substances ... that were not consistent with what legitimate pharmacies typically ordered").

[9]      21 CFR section 1301.71 imposes upon all "registrants" (that is, all manufacturers, distributors and dispensers of controlled substances) the mandatory obligation to "provide effective controls and procedures to guard against theft or diversion of controlled substances". See Master's Pharm. supra, 861 F. 3d at 222- 223 (distributor must act to immediately report to "DEA all orders of an unusual size, frequency, or pattern [unless it] chooses to shoulder the burden of dispelling all of the (red flags' that gave rise to the suspicion that the customer was diverting controlled substances" (citation omitted). The DEA "security requirement at the heart of the case mandates that distributors design and operate a system to identify suspicious orders of controlled substances and report those orders to the DEA" (interior quotation marks deleted) (Masters Pharm., 851 F. 3d at 213 — 214). The

those medications substances would not be diverted into illegal schemes". Masters Pharm., Inc.

v. DEA, 861 F. 3d 211-212 (D.C. Cir. 2017). (See 21 C.F.R. section 1301.77, discussed in n. 7 - 9

infra).

      Relator asserts that in 2002 if not before PURDUE and each other DEFENDANT

DISTRIBUTOR knew or had the opportunity to know[10] that the ORIGINAL OXYCONTIN product

each had and continued to distribute as vendor to its US drug store and pharmacy customers

was subject to ongoing wide-spread illicit diversion and abuse and that many of its retail

customers had filled prescriptions for persons who were addicts or suppliers of addicts. (See

infra paragraphs 41.A — 41.F.)

Relator further asserts that beginning in 2002 if not before PURDUE and each

other DEFENDANT DISTRIBUTOR were required to maintain certain internal records that

contained their sales and distribution data from which they could determine which of their

retail drug store and pharmacy customers ("Suspect Pharmacies") had undertaken to dispense

ORIGINAL OXYCONTIN to persons then engaged in illicit diversion through criminal schemes

related to the making of false claims of "medical necessity", a necessary first-step toward the

---

mandatory reporting requirement was enacted "so that DEA investigators in the field can aggregate reports from every point along the legally regulated supply chain and use the information to ferret out potential illegal activity" (interior quotation marks and citations omitted) (Id., 861 F. 3df at 212). See Federal Register, vol. 80 no. 178: DEA

Decision and Order dated September 15, 2015 in re Masters Pharmaceuticals, Inc. docket no. 13 — 38 at pp 55500 — 55501 for Summary of findings of ongoing violations of 21 CFR 1301.74(b), such as rarely investigating any order of suspicious size, whether by ('contacting the pharmacy and obtaining an explanation for such order [or by] independently verifying that explanation; or filling an order "without obtaining an explanation from the pharmacy; or by ⁱʲentirely" deleting an order "as if it had never existed rather than report it as suspicious" or by editing and order and "reducing its size so that the pharmacy's orders did not place it over its CSL [Controlled Substance Limit]".

10 Among other things, the DEA regulations prohibit the filling of a prescription to a drug store or pharmacy where that order was deemed "suspicious". Under that circumstance, the distributor could decide not to fill the order or to decide to make an immediate report to the DEA of any order of "unusual size, frequency, or pattern" or could instead require the drug store or pharmacy to produce its "actual dispensing records". Masters Pharm., 861 F. 3d at 222 — 223 (citation omitted).

submission of each such false claims to Medicaid for payment, and that such knowledge on the

part of the PURDUE and each other DEFENDANT DISTRIBUTOR satisfies the definition of

"knowing" or "knowingly" set forth in 31 U.S.C. section 3729 (b), subparts (i) — (iii).

Relator asserts that as a proximate cause of such willful and knowing failures, PURDUE

and each other DEFENDANT DISTRIBUTOR have knowingly made or caused to have been

made multiple false records or statements material to the submission of numerous false or

fraudulent claims for purposes of payment by Medicaid and have knowingly conspired with

PURDUE to commit numerous violations of FFCA section 3729 (a) (1) and MFCA section 5A

and related Co-Plaintiff FCA Statutes and should therefore be held liable for statutory damages

each government has incurred under both the Federal and Massachusetts False Claims Act,

the related Co-Plaintiff FCA Statutes and under related provisions of the common law of the

Commonwealth of Massachusetts. (See FFCA section 3732(b), infra paragraph 12). These

claims include two separate categories of damages: First, for statutory penalties and/or

consequential damages for each false claim submitted to Medicaid for payment by physicians

then engaged in an illegal enterprise to sell and distribute the ORIGINAL FORMULATION to

addicts and their suppliers (See paragraphs 60 — 65 infra); and, Second, for consequential

damages arising under state law claims of products liability, fraud, unjust enrichment, and

consumer protection statutes including but not limited to Chapter 93A of Massachusetts

General Laws (See Counts Five and Six infra) related to the expenses paid by each government

as a part of its Substance Abuse and Addiction treatment programs, which expenditures were

separate and apart from the health care services and products it paid as a part of its Medicaid

program payments. (See paragraphs 76, 85, 92.A, 97.A, 104.A, and 109.A. infra).

Lastly, Relator asserts that the applicable statutes of limitations should allow the

UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS, each OTHER CO-PLAINTIFF

STATE and ALL LOCAL GOVERNMENT INTEVENORS under the provisions of their state's FCA

to recover damages under the related provisions of the federal and state false claims acts for

the period 2006 — 2018 (applicable period for each of the named-plaintiffs in the original 2016

action (See n.l supra) and from date of intervention of each subsequent intervening plaintiff

(See paragraph 54. C infra) and under the common law of the Commonwealth of Massachusetts

for the period 2002 — 2017. (See paragraph 54.D - 54.E infra). (See paragraphs 54F for

discussion of Massachusetts "functional choice of law" rules)

## JURISDICTION and VENUE

1.      This is a civil action by Relator, acting on behalf of and in the name of the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS, each OTHER CO-PLAINTIFF STATE and all LOCAL GOVERNMENT INTERVENORS who hereafter elect to intervene in the pending action against PURDUE and the DEFENDANT DISTRIBUTORS under FFCA sections 3729- 3733, MFCA sections 5A — 5H and under related provisions of the common law of the Commonwealth of Massachusetts.

2.      Relator commenced this action by filing his original complaint with the Court in camera and under seal as required by FFCA section 3730 (b) (2) and MFCA section 5C (3) and thereafter served the Attorney Generals of the United States and each Co-Plaintiff State with a copy of the complaint and all material evidence and information used by Relator in preparing

---

11 (See e.g., MFCA section 5A ( $^U$Political subdivision", authorized to pursue claim under section 5B, defined as "city, town, county or other governmental entity authorized or created by law, including public corporations and authorities").

his complaint. (See Summary of Attachments identifying documents cited in the complaint as well as copies of those documents in electronic format that have been filed as Exhibits[5] in the pending action subsequent to the filing of the First Amended Complaint). Relator respectfully asserts that the filing of this Third Amended Complaint can be filed electronically and need not be placed under seal due to the December 19, 2017 Order of the Court.

2.      This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. sections 1331 and 1345 and FFCA sections section 3732(a).

---

[5] Summary of Attachments submitted as Appendix A. Documents identified on Summary have been filed with the Court as Exhibits # 1 - 42.

3.      This Court has jurisdiction over the statutory claims alleged herein brought on behalf of the Commonwealth of Massachusetts, each Other Co-Plaintiff State and all Local Government Intervenors under FFCA section 3732(b). In addition, the Court has supplemental jurisdiction over the common law claims brought on behalf of the UNITED STATES, the COMOMONWEALTH OF MASSACHUSETTS, each OTHER CO-PLAINTIFF STATE and all LOCAL GOVERNMENT INTERVENORS under 28 U.S.C. section 1367.

Relator asserts standing on behalf of the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS, each OTHER CO-PLAINTIFF STATE and all LOCAL GOVERNMENT INTERVENORS to pursue all claims set forth in Counts Two — Eight of the complaint under the supplemental jurisdiction provisions of FFCA section 3732 (b). See Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765 (2000). HN 7 — 8.

4.      Venue is appropriate in this district under 28 U.S.C. sections 1391(b)-(c) and 31 U.S.C. section 37326) because PURDUE and each other DEFENDANT DISTRIBUTOR can be found, reside, or have transacted business in this judicial district, and acts proscribed by FFCA. section 3729 have been committed in this district.

## THE PARTIES

5.      Plaintiff/Relator Robert E. Manchester is a Vermont attorney and resident. Mr. Manchester has provided the United States, the Commonwealth of Massachusetts and each Other Co-Plaintiff State with a copy of this Third Amended Complaint pursuant to Local Rule 5.2.

6.      The real parties in interest in this action are the United States of America, the Commonwealth of Massachusetts, each Other Co-Plaintiff State and all Local Government intervenors who subsequently elect to intervene in the pending action under FFCA section 3730(b). Relator Seeks damages on behalf of each such Plaintiff for economic harm resulting

12

from the submission of false claims by or on behalf of PURDUE and each other Defendant Distributor to government health insurance programs under both FFCA section 3729 et seq. and MFCA section 5A et seq. and related sections of each Co-Plaintiff State's FCA. (See n. 1 supra). Further, Relator seeks in addition damages under common law principles of product liability, fraud, consumer fraud, and unjust enrichment for all actual and consequential damages sustained by each such Plaintiff during the years 2002 — 2010 as a part of its spending on SUBSTANCE ABUSE and ADDICTION that was caused by and related to PURDUE's sales and distribution of ORIGINAL OXYCONTIN. (see COUNTS THREE - EIGHT infra).

7.      Defendants Purdue Pharma L.P. and Purdue Pharma Inc. are partnerships organized under the laws of Delaware with a principal place of business in Stamford, Connecticut. Defendant The Purdue Frederick Company, Inc. is a Delaware corporation with its principal place of business Stamford, Connecticut. Such Defendants are identified herein collectively as "PURDUE". Defendant McKESSON is a Delaware corporation with a principal place of business in San Francisco, CA. Defendant CARDINAL is an Ohio corporation with a principal place of business in Dublin, OH. Defendant ABC is a Delaware corporation with a principal place of business in Chesterbrook, PA.

8.      PURDUE is a manufacturer and distributor of pharmaceutical products, including the Class II opioid pain medication tablet that it markets and distributes for purposes of sale under the brand-name "OxyContin". During the period between approximately January 1, 1996 and August 10, 2010 PURDUE manufactured and distributed for purposes of sale its ORIGINAL FORMULATION. From 1996 — 2010 the other Defendant Distributors acted as agents and distributors on behalf of PURDUE to distribute millions of tablets of ORIGINAL OXYCONTIN to retail pharmacies and drug stores located in all US states and territories.

## APPLICABLE FEDERAL AND STATE STATUTES

9.      Plaintiffs the United States of America, the Commonwealth of Massachusetts and each other Co-Plaintiff State (See n. 1 supra) administer the federal Medicare and Medicaid programs, among others. On behalf of all such Plaintiffs, Relator Seeks damages resulting from the submission of false claims to federal health insurance programs under FFCA section 3729 et. seq., MFCA section 5A et seq., and related sections of each Co-Plaintiffs' FCA statutes. (See n. 1).

10.      Federal law and regulations, applicable to all participating states and territories, obligate any health care practitioner and any other provider of health care services that may be reimbursed by Medicaid or Medicare to assure, to the extent of their authority, that services or items ordered or provided to beneficiaries and recipients will be (1) provided only when medically necessary, (2) of a quality that meets professionally recognized health care standards, and (3) supported by evidence of medical necessity and quality. (See 42 U.S.C. section 1320c-5,

42 C.F.R. 5 1004.10 and related regulations of each of the Co-Plaintiff States). (See e.g., Massachusetts Regulation # 1301 (958 CMR 3.020) (Attachment 25). In this action Plaintiffs the United States of America, the Commonwealth of Massachusetts, and each Other Co-Plaintiff State Seek to recover, subject to 42 U.S.C. section 1396h, the money each expended pursuant to the federal medical assistance program. Such Plaintiffs acknowledge that the federal statutory lien varies among other things upon the applicable Federal Medical Assistance Percentage ("FMAP") in force as of date of payment (reimbursement) made to each Co-Plaintiff State by the United States.

11. Relator respectfully requests the United States, the Commonwealth of

14

Massachusetts, and each Other Co-Plaintiff State and/or Local Government Intervenor to

intervene as in this action under either FFCA section 3730(b) (2) (United States) or FFCA 3732

(b). Further, Relator respectfully requests each such Plaintiff to intervene for a second purpose;

that is, to assist Relator obtain the document discovery he seeks from PURDUE

(See Attachment 32 identified on Summary) under FFCA section 3733 ((a) (1) and MFCA section

## SUMMARY OF COMMON LAW

## <u>CLAIMS ASSERTED IN AMENDED COMPLAINT</u>

12.   This action asserts statutory and common law claims against Defendants

PURDUE, McKESSON, CARDINAL and ABC, as manufacturer and/ or as distributor and vendor

of a Class II opioid brand-name pain-reliever prescription product known as "OxyContin". The

action is brought on behalf of the UNITED STATES, the COMMONWEALTH OF

MASSACHUSETTS, all OTHER CO-PLAINTIFF STATES and all LOCAL GOVERNMENT

INTERVENORS by a Relator under

FFCA sections 3730 (c) (3) and 3732 (b) and MFCA section 5B and related sections of each

CoPlaintiff State's FCA (See n. 1). This action is also brought on behalf of each Plaintiff

as a common law qui tam action wherein, the Relator asserts standing to act in parens patriae

on behalf of each such Plaintiff and its citizens in a cost-recovery action that seeks to recover

monies expended by each such Plaintiff to fund its Substance Abuse and Treatment Programs

for persons of the United States who became addicted to OxyContin prior to 2010 when

PURDUE discontinued further sale or distribution of the ORIGINAL FORMULATION of its

product. (see infra, COUNTS THREE - EIGHT infra).

13.   The complaint contain eight separate counts: COUNT ONE Seeks among other

things a declaratory judgement that the various 2007 state and federal Settlement Agreements or Consent Judgments do not limit or preclude the claims for damages asserted by Relator on behalf ofthe UNITED STATES or any CO-PLAINTIFF STATE in COUNTS TWO - EIGHT of the complaint (See paragraphs 54.A — 54.D infra); COUNT TWO asserts a claim for liability and damages pursuant to the Federal and Commonwealth of Massachusetts False Claims Acts and related sections of each Co-Plaintiffs FCA statutes (See n.l supra); COUNT THREE asserts a claim of liability and damages for design defect pursuant to Restatement (Second) of Torts section 402A (See paragraphs 67 — 76 infra); COUNT FOUR asserts a claim of liability and request for injunctive relief and damages for unjust enrichment (See paragraphs 77 — 85); COUNT FIVE asserts a claim of liability and request for injunctive relief and damages for consumer fraud against PURDUE under the Massachusetts Consumer Protection Act ("MCPA") (See paragraphs 86 — 92 infra); COUNT SIX asserts a claim of liability and damages for consumer fraud under MCPA against the DEFENDANT DISTRIBUTORS (See paragraphs 93 — 97 infra); COUNT SEVEN asserts a claim of liability and damages for common law fraud arising out of PURDUE's affirmative obligation as "registrant [6] to comply with the mandatory reporting obligations set forth in 21 C.F.R. sections 821 - 830 (See paragraphs 98 — 104 infra); and COUNT EIGHT asserts a claim of liability and damages for common law fraud arising out of each DEFENDANT DISTRIBUTOR'S affirmative obligation as "registrant" to comply with the mandatory reporting obligations set forth in 21 C.F.R. section 821 — 830. (See paragraphs 105 — 109 infra).

---

[6] See n. 6— 10 infra.

## NATURE AND EXTENT OF OXYCONTIN EPIDEMIC

14.    In December 1995 PURDUE obtained approval from the United States Food and Drug Administration ('FDA") of its New Drug Application no. 20-553 ("NDA 20-553") (Attachment 1). This approval authorized PURDUE to market and sells within this country a pharmaceutical product with the brand-name of [U]OxyContin". This product is a Schedule II controlled substance that presents a risk of opiate addiction to its users similar to morphine. This approval required PURDUE among other things to "comply with the requirements for an approved NDA set forth under [1992] 21C.F.R. section 314.80 and 314.81" (Attachment 1, id., p 2).

15.    In its ORIGINAL FORMULATION, the risk of addiction of OxyContin was made much worse by the defective design and construction of the tablet, that lacked the necessary physical structure and chemical composition ("hardness") required to prevent "rampant abuse of the drug". (In re OXYCONTIN ANTITRUST LITIGATION, 994 F. 2d 367, 414 (S.D. New York, January 14, 2014) (Attachment 2) (hereafter "383 PATENT LITIGATION") (aff'd sub nom, In re Purdue Pharma, L.P. v. Epic Pharma, L.L.C., 811 F. 3d 1345 (Fed. Cir. 2016); and the concomitant development of an enormous country-wide illicit market for the product, a socalled "pill mill" operation whereby PURDUE through its distributors sold vast volumes of its ORIGINAL FORMULATION to illicit drug wholesalers and retailers and physicians who diverted that product for distribution to persons who had become addicted to opiates.

16.    Illicit distribution of the ORIGINAL FORMULATION began shortly after initial distribution of the ORIGINAL FORMULATION in 1996 and then multiplied due to illegal distribution practices undertaken by PURDUE whereby it sold and distributed the ORIGINAL FORMULATION, and particularly its 80 mg tablet, to certain "pill mill operators" whom PURDUE had identified as early as 2002 if not before. The pill mill operation that PURDUE enabled

17

became a multi-state operation and expanded exponentially each year from 1996 through 2010 when, for example, more than 1,000 Florida pain clinics purchased from PURDUE or its distributors more than 30 million doses of its ORIGINAL FORMULATION during the first six months of 2010 (a sales volume that constituted about 89% of PURDUE's total physician sales during that year) (New York Times article dated August 31, 2011). (Attachment 3).

17.    PURDUE's "pill mill" operation continued after 2001 when PURDUE and its distributors McKESSON, CARDINAL and ABC had actual knowledge based upon their INTERNAL SALES AND DISTRIBUTION DATA that contained sales information involving (i) physician profiles and their prescribing practices AND/OR (ii) use and prescription patterns of each retail pharmacy and drug store that a significant number of their prescribing physicians and pharmacies were engaged in an illegal enterprise whereby they wrote prescription slips or purchased for illicit distribution vast quantities of the ORIGINAL FORMULATION for diversion to persons then addicted to OxyContin or their suppliers. (See paragraphs 41.A — 41.F infra.)

18.    Upon information and belief, vast quantities of the ORIGINAL OXYCONTIN that was sold to pill mills in other states were transported and then sold to persons then residing in Massachusetts and all US states and territories, including both persons addicted to the ORIGINAL FORMULATION and their suppliers.

19.    Upon information and belief, during the years 1996 to 2001, PURDUE's total domestic sales of its ORIGINAL FORMULATION increased from about $44 million in sales (316,000 prescriptions) in 1996 to more than $2.5 billion in sales (14 million prescriptions) in 2001. After 2001, and until 2010 when PURDUE discontinued further distribution and sales of its ORIGINAL FORMULATION, product sales increased to more than $3.0 billion per year. During such time, also upon information and belief, the Defendant Distributors distributed for

18

purposes of sale to retail pharmacies and drug stores located in all US states and territories at least of PUDUE's ORIGINAL FORMULATION.

20.    The design and manufacturing defect present in the ORIGINAL FORMULATION resulted in the onset of "a public health epidemic" that began soon after 1996 once patients discovered that the tablet, as constructed, could easily be crushed into power, with the result that the time-release mechanism of the tablet would be defeated and the full strength of the narcotic present within the tablet would be "released at once" into the blood stream of the user (383 PATENT LITIGATION, 994 F. supp. 2d at 414). (Id. Attachment 2).

21.    By 2001 thousands of Americans were addicted to the ORIGINAL FORMULATION of OXYCONTIN. They had become opiate addicts due to the defective design and construction of the tablet used in the ORIGINAL FORMULATION, a design that lacked the necessary hardness required to prevent intentional or inadvertent crushing of the tablet.

22.    In 1995 when PURDUE obtained FDA approval of its OxyContin New Drug Application (NDA 20-553) (id. Attachment 1), it knew that the safety and effectiveness of its product was dependent upon the "Delayed absorption, as provided by [its] OxyContin tablets [that it stated] is believed to reduce the abuse liability of a drug". (2007 Agreed Statement of Facts, dated May 7, 2009 signed by United States and PURDUE, paragraph 18) ("2007 Agreed Statement") (Attachment 4). In addition, PURDUE then knew that "Oral oxycodone [a "semisynthetic opioid agonist which has been available for clinical use since 1917"] is approximately twice as potent as oral morphine on a milligram basis". (Id., Attachment 1, section 1.0.

Background of Clinical Pharmacology and Biopharmaceutics Review, p 2).

23.    In its 1995 NDA PURDUE did not provide the FDA with any clinical data that demonstrated that OxyContin "was less addictive, less subject to abuse or other diversion, or

less likely to cause tolerance and withdrawal than other medications" (2007 Agreed Statement, paragraph 14. (Id. Attachment 4).

24.    On October 24, 1995 the FDA prepared an internal Medical Officer Review ("MOR") that stated in part: (i) that "The adverse experience profile of [OxyContin] is qualitatively similar to that of the parent drug, oxycodone" and (ii) that "Withdrawal is possible in patients who have their dosage abruptly reduced or discontinued" (2007 Agreed Statement, paragraphs 16 — 17). (Id. Attachment 4).

25.    Prior to approval of NDA 20 — 553, neither PURDUE nor the FDA evaluated whether the tablet PURDUE intended to use as a pill matrix for its OxyContin product had sufficient physical or chemical hardness to prevent inadvertent or deliberate tampering of the tablet that would result in "the time release aspect of the formulation being destroyed and the opiate being released at once". (383 PATENT LITIGATION, 994 F. supp. 2d at 414). (Id. Attachment 2). Further, neither PURDUE nor the FDA considered whether one or more clinical studies were required to determine on an ongoing basis whether the ORIGINAL FORMULATION would cause addiction or withdrawal symptoms in persons who were prescribed extended or long-term dosages of OxyContin for use on an out-patient basis or whether crushing of the ORIGINAL FORMULATION tablet would become wide-spread and lead to a high level of abuse once addicts and their illicit suppliers became aware that the tablet was readily susceptible to crushing for purposes of illegal injection or snorting.

26.    In 1993 PURDUE filed a patent application for its product with the U.S. Patent Office. That application was granted on April 16, 1996 by patent no. 5,508,042 (hereafter "042 Patent"). (Attachment 5). The expiration date for that patent was April 16, 2013. In its 042 PATENT, PURDUE claimed that the its proposed invention would provide a "controlled release composition" of its opioid medication ''that acceptably controls pain over a substantially

narrower daily dosage range" and "have substantially less inter-individual variation with regard to the dose of opioid analgesic required to control pain without unacceptable side effects". (Id. pp 1 — 2). PURDUE identified several types of coatings that it intended to use to provide a "controlled release mechanism" without also identifying any physical or chemical means intended to prevent "parenteral, nasal and/or oral abuse of [the] pharmaceutical active ingredients [of its product and its] abuse potential" (patent no. 8,114,383 B 2, filed on November 20, 2003 by Grunenthal GmbH ("383 Patent") p 2, claim No. 30 asserted by Grunenthal GmbH. (Attachment 6).

27.    On November 29, 2007 PURDUE submitted to the FDA a New Drug Application that proposed a reformulated OxyContin. That NDA ( 'I NDA 022272") was approved by the FDA on April 5, 2010. (id., Attachment 7). (see also 383 PATENT LITIGATION, 994 F. 2d at 415). (Id. Attachment 2). The reformulated product contained an "abuse-proof formulation", which PURDUE had developed using licensing rights it had obtained from a German company, Grunenthal GmbH. NDA 022272 required, among other things, that PURDUE "conduct epidemiological studies to address whether the changes made to the OxyContin ... Controlled Release ... Tablets [the REVISED FORMULATION] ... actually result in a decrease in the risks of misuse and abuse, and their consequences". (See FDA NDA 022271 Approval Letter, dated April 5, 2010 p 2; Id. Attachment 7).

28.    The license PURDUE obtained from Grunenthal pertained to its November 20, 2003 patent application entitled: "ABUSE-PROOFED DOSAGE FORM". Grunenthal's patent application was granted on February 14, 2012 by patent no. 8,114,383 (the "383 Patent"). (Id., Attachment 6). The expiration date for the 383 Patent is October 24, 2024.

21

29.     By acquiring the 383 license, PURDUE acquired for the first time the ability to produce an "extremely hard" tablet sufficient in design and construction to prevent crushing or injecting of the product, a necessary first-step toward developing an abuse-proof tablet.

30.     In 2011, if not before, PURDUE obtained a separate license from the Board of Regents of the University of Texas System ("Texas Board of Regents"). This license pertained to Patent no. 6,488,963 Bl (hereafter the "963 Patent"). (Attachment 8). It enabled PURDUE to use the "hot-melt extrusion process" that had been developed by University of Texas scientists in 1995. In their March 2, 1999 patent application, the inventors claimed that their process was "particularly well suited for oral delivery ... [of] ... controlled-release pharmaceutical formulations". The hot-melt extrusion process was first published by the inventors on December 31, 1997 in their application filed with the World Intellectual Property Organization. (See Attachment 9: (F Zhang, JW McGinity, "Properties of sustained-release tablets prepared by hot-melt extrusion" and list of related articles). (See 383 PATENT LITIGATION, 994 F. Supp. 2d at 421). (Id. Attachment 2). (See also paragraphs 44 - 46 infra).

31.     On April 16, 2013 the FDA withdrew its prior label issued for the ORIGINAL FORMULATION of OxyContin. On that date the FDA also approved a new label that allowed PURDUE to market its REVISED FORMULATION as having "abuse-deterrent properties". (Attachment 10). (See also 383 PATENT LITIGATION, 994 F. supp. 2d at 415). (Id. Attachment 2).

32.     Upon information and belief, since April 2013 PURDUE has discontinued any further domestic marketing or sales of its ORIGINAL FORMULATION. Since then, it has distributed for purposes of sale within the United States only those tablets made using its REVISED

FORMULATION, a product it continues to manufacture using technologies licensed to it under either the 383 or the 963 Patents or related patents later acquired by PURDUE. (See complaint filed by PURDUE and Texas Board of Regents against TEVA PHARMACEUTICALS USA, INC., on

April 3, 2014, in the Southern District of New York, docket no. 1:14 — cv — 02357 — SHS,

paragraphs 13, 23 — 41): summary of OxyContin patents issued to or licensed by PURDUE, as

listed in the so-called Orange Book maintained by FDA). (Attachment 11).

33.     Upon information and belief, on or about August 2010 PURDUE made the decision

to terminate any further shipments of its ORIGINAL FORMULATION to its domestic distributors,

including but not limited to Defendants McKESSON, CARDINAL and ABC.

34.     Upon information and belief, when PURDUE decided to terminate any further

shipments of its ORIGINAL FORMULATION, it also made the decision not to buy back or

otherwise retrieve or prevent any further sales or distribution of its ORIGINAL FORMULATION

to its domestic distributors or retailers or their health care provider customers.

35.     From 1996 to 2001, PURDUE distributed vast quantities of its ORIGINAL

FORMULATION. In 2001, for example, it sold 14 Million prescriptions and realized more than

$2.5 Billion in product sales. During this five-year period PURDUE did not voluntarily restrict its

sales to ONLY those patients who had critical need of strong opiate medication and who could

be prescribed that medication in hospital settings where the administration of the drug could

be carefully monitored and controlled by pain medicine specialists. INSTEAD, PURDUE pursued

an aggressive marketing campaign directed toward numerous diverse physician groups

particularly primary care physicians. In this effort PURDUE increased product sales of its

ORIGINAL FORMULATION by more than 4400% from 1995 to 2001. This marketing effort

resulted in a criminal conviction for product misbranding in 2007. (See description of U.S.

Department of Justice plea bargain, paragraph 47 - 49 infra).

36.     On or before July 23, 2007, when the Hon. James P. Jones accepted the plea

agreement reached by PURDUE and the United States Department of Justice. (See United

States v. Purdue Frederick Co., 495 F. Supp. 2d 569, 576 — 578 (W.D. Virginia 2009 (Attachment 12), PURDUE had actual knowledge of the addiction risk and propensity for abuse by users of its ORIGINAL FORMULATION that contained "several doses of oxycodone — a powerful opiate — into a single tablet that released the oxycodone over time [and further knew that its product] was subject to tampering ... because abusers could crush the tablets easily into powder [with the result that] the time release aspect of the formulation [would be] destroyed and the opiate [would be] released at once". (See 383 LITIGATION, 994 F. Supp. 2d at 414). (Id. Attachment 2). Further, PURDUE then knew or should have known that large quantities of its ORIGINAL FORMULATION, particularly its 80 mg tablet, had been and was continuing to be prescribed illegally by physicians for sale to and use by addicts and their suppliers.

A.   Notwithstanding such knowledge, PURDUE undertook to continue unrestricted marketing and distribution of its ORIGINAL FORMULATION for ultimate prescription to and use by US consumers without first developing, or acquiring licensing rights from third-parties of, a drug-abuse deterrent technology that would prevent, or at least substantially reduce, the addiction risk and propensity for abuse of its ORIGINAL FORMULATION.

B.   Furthermore, at all times material between 2001 -2007, PURDUE had actual knowledge from its INTERNAL SALES DATA that several hundred or more of its prescribing physicians were acting "recklessly" and illegally prescribing the ORIGINAL OXYCONTIN product, particularly the 80 mg tablet, for distribution to addicts or their suppliers.

C.   In 1995 when PURDUE obtained approval by the FDA of its NDA 20-553 (Attachment 1) it was unaware that chemical and physical design and construction of its ORIGINAL FORMULATION would create a "public health epidemic" and result in wide-spread illicit sale and diversion to addicts and their suppliers. As of that date, PURDUE had neither evaluated nor

24

prepared for submission to the FDA any clinical or epidemiologic study that evaluated or predicted a probable rate of illicit sale or abuse of its ORIGINAL FORMULATION if dispensed by primary care physicians to patients for use on extended or long-term doses on an out-patient basis. Among other things, PURDUE failed to recognize or anticipate the extent to which its 80 mg tablet would become a sought-after opioid by those persons including addicts and the3ir suppliers then engaged in the illicit sales and distribution of narcotics within the US.

      D. By 2002, however, PURDUE knew that its ORIGINAL FORMULATION was subject to wide-spread illicit diversion and abuse, and that several hundred or more of its prescribing physicians were then acting recklessly and illegally prescribing its ORIGINAL OXYCONTIN product for distribution to addicts or their suppliers. (See 383 LITIGATION, 994 F. Supp.2d at 413 — 414. (Id. Attachment 2). Based upon this knowledge, PURDUE had the affirmative obligation [7] to comply with 1997 21 CFR 314.80 and advise the FDA that it had learned from its INTERNAL SALES DATA of a "significant increase in frequency of an adverse drug experience that is both serious and unexpected" as defined by that regulation (15-day reporting requirement that applies to any "significant increase in frequency of a serious, expected adverse drug experience" including "overdose [that] is always to be considered serious" (21 CFR 314.80). (See n.l. supra). This obligation required, among other things, PURDUE to advise the FDA of its list of Suspect Physicians and, in addition, of the internal criteria that PURDUE had developed in order to identify the "atypical patterns of prescribing" as an indicator of potential or probable abuse or illegal diversion of the ORIGINAL FORMULATION by such

---

[7] In his decision, Judge Stein did not address PURDUE's obligation as "registrant" to comply with the mandatory reporting obligations OF 21 C.F.R. section 1301.71. See n. 8 - 10 supra. See Counts SEVEN and EIGHT infra.

Physicians.

E. Upon information and belief, prior to and during its negotiations with the U.S. Department of Justice, that were concluded prior to the date of its criminal sentencing in 2007, PURDUE did not inform the Department of Justice, the FDA or DEA or any other federal or state law enforcement or public health organization, or Judge Jones of the following: First, of the existence of its INTERNAL SALES DATA that then required PURDUE to make periodic mandatory reports of "significant increases in frequency" of illicit sales and abuse of its product or of the internal conclusions PURDUE had reached based upon its review of that DATA; or, Second, of the existence of the "manufacturing problem" it had determined rendered its product unable "to produce its expected pharmacological action". (See 1985 21 CFR 314.80 (a) at p 1).

37.     As a proximate consequence of PURDUE's (1) aggressive marketing scheme and its knowing and intentional failure to voluntarily restrict sales of its ORIGINAL FORMULATION to only_those patients who (i) had a critical need of strong opiate medication and (ii) could be prescribed that medication in a controlled hospital setting where dosages and treatment plans could be carefully monitored until such time when it could develop or acquire licensing rights from third-parties of abuse-proof technologies for its product, and further_knowing and intentional failure to comply with the mandatory reporting obligation imposed on it under 1992 21 CFR section 314.80; (2) willful and knowing failure to comply with the mandatory reporting requirements of 21 C.F.R. section 1301.71; and (3) willful and knowing joint enterprise and conspiracy with hundreds or more Suspect Physicians and Suspect Pharmacies to submit or to cause to be submitted false claims to the United States, the Commonwealth of Massachusetts and each Other Co-Plaintiff State in violation of section 3730

(a) (1) (c) and section 5A MFCA and related sections of each Co-Plaintiff's FCA, PURDUE and each of the DEFENDANT DISTRIBUTORS have forced local, state, and federal governments to expend vast sums of taxpayer funds in order to pay for programs that were required to protect the public's health and safety. These programs relate to and involve the immediate "consequences of substance addiction" as well as ongoing "prevention and treatment" programs. See Report of New York Attorney General, dated May 2011, "Internet System for Tracking Over-Prescribing (I-STOP)". (Attachment 13 p 10).

A.    The total expenditures for 2005 have, for example, been estimated to have been "at least $467.7 billion — $238.2 billion at the federal level; $135.8 billion at the state level; and $93.8 billion at the local level". (Id. Attachment 13 p 10). (See Attachment 14: 2009 Report of National Center on Addiction and Substance Abuse, entitled "Shoveling it Up II", Foreword p i).

B.    The State of New York spent 21.1% of its General Fund ($13.132 billion) on its "impacted public programs", an amount "that translates to $680.19 per capita". (Id. Attachment 14, p 11). By comparison, in 1998 the State of New York spent much less of its General Fund for such programs (about $8.7 billion expended, about 40% less than the amount expended in 2005). (See Table 6.1, submitted as addendum to Attachment 14).

C.    The per capita expenditure for 2005 for five of the six New England states was as follows: Maine, $893; Vermont, $779; Connecticut, $745; Massachusetts, $699; New Hampshire, $408; and Rhode Island (2005 data not included in report). (Id. Table 4.3 p 40).

D.    In 2005 Vermont expended 18.4% of its State Budget on Substance Abuse Programs (Id. Table 4.3). The total amount expended by Vermont for 2005 was $476 Million. By comparison, in 2005 Massachusetts expended 21.8% of its State Budget on Substance Abuse

27

Programs (Id.), an expenditure that for 2005 totaled $4.5 billion. (Id.).

E.      The percentage of State Budget expended for Substance Abuse and Addiction Programs in these five states ranged between Connecticut, at 14.7% and Maine, at 26.9% (Id. Tables 4.3 And 4.4 pp 39 — 40). The total amounts expended in 2005 by these five states for Substance Abuse and Addiction Programs exceeded $8.2 billion dollars. (Id. Table 4.3).

38.     From 2001 through the date of its criminal sentencing in 2007, PURDUE failed to develop or acquire licensing rights to use drug-abuse deterrent technology in its ORIGINAL FORMULATION even though such technology was then known and available to other manufacturers of "abuse-proofed controlled release medications" (See 383 PATENT, paragraph 1, "Background of the Invention" (Id. Attachment 6). (See also paragraphs 28 — 30 infra). Furthermore, following its federal court conviction, PURDUE failed to limit sales or distribution of its ORIGINAL FORMULATION until it could develop, or acquire, an effective drug Abuse-deterrent technology.

39.     In 2001 PURDUE undertook through its in-house research and development team to develop "a tablet that would be difficult to crush or to syringe" (See 383 PATENT LITIGATION, 994 F. Supp 2d at 415). (Id. Attachment 2). That effort continued for more than five years but proved unsuccessful. (Id). In 2003, as a part of that effort, PURDUE became aware of certain technology that had been developed and patented by Grunenthal GmbH, a German company, of a tamper-proof, crush-resistant tablet. (See paragraphs 27 — 29 supra). In "a series of 'long and tough' multi-year negotiations", PURDUE eventually paid Grunenthal more than $220 Million in order to obtain a licensing agreement to use Grunenthal's technology (See 383

PATENT LITIGATION, 994 F. supp 2d at 415). (Id. Attachment 2). PURDUE began using the Grunenthal technology in its REVISED FORMULATION that it began distributing to pharmacies in 2010. (See paragraphs 30— 32 supra).

40.    From 2001 through 2010 PURDUE distributed in the United States more than 52 million tablets and realized total product sales in excess of $28 billion of its ORIGINAL FORMULATION. Many of the sales made by PURDUE took place in states where the total sales per capita far exceeded PURDUE's national average sales for the ORIGINAL FORMULATION. For example, PURDUE sold more than 32 million tablets in Florida during the first six months of 2010, a sales volume that "fell by 97%" after Florida enacted "a limit on the number of pills a doctor could dispense". (See id. Attachment 3 p 1).

41.    Upon information and belief, PURDUE and the DEFENDANT DISTRIBUTORS had obtained and were in possession of sales and distribution records of its ORIGINAL FORMULATION, which PURDUE and the DEFENDANT DISTRIBUTORS could review on at least a monthly or quarterly basis. This data was contained in such DEFENDANT'S INTERNAL SALES DATA that was obtained (i) by PURDUE sales force and from IMS Health, a third-party

information and technology services company then doing business with PURDUE or (ii) by PURDUE and each of the DEFENDANT DISTRIBUTORS from each pharmacy's "actual dispensing records" that were in the actual or constructive possession of each DEFENDANT[8] and from other related information from which PURDUE and the other DEFENDANT DISTRIBUTORS could determine by state and county of sale: (i) the names and addresses of each pharmacy that

---

[8] See id., Masters Pharm., Inc, 861 F. 3d at 222, and n. 8— 10 supra: Distributor is required to request a written document, known as a "UR", to "document customers' explanations for suspicious orders, so that he or she can verify those explanations and make sure they are consistent over time" (citation omitted).

sold its products; (ii) the names and address of each hospital, clinic or physician or other medical provider who prescribed its product to patients; and iii) the actual prescription patterns of prescribing as an indication of potential abuse or illegal diversion of OxyContin as specified in the "SEVEN MANDATORY REPORTING CRITERIA" identified in Paragraph 13 of the 2007 Massachusetts Consent Judgment. (Attachment 15). (See paragraph 51 infra).

A. By 2002, if not before, PURDUE had developed certain internal criteria that it used to create a so-called "Region Zero" list. This list was "a confidential roster of physicians [compiled by a panel of three company lawyers that identified physicians suspected of <u>recklessly</u> prescribing the ORIGINAL FORMULATION] to addicts or dealers" (emphasis added) (Attachment 16 (LA TIMES article: "More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew "dated July 10, 2016 by Harriet Ryan, Lisa Girion and Scott Glover, p 5).

B. Purdue did not publically "reveal the existence of [the Zero Region] list ... until 2013". (Id. p 5). By that date Purdue "acknowledged that there were more than 1,800 doctors [that Purdue had identified and placed on its Zero Region list]". (Id.). As of 2013 PURDUE has admitted that it had "reported only about 8% of the doctors on that list to authorities" (id.). In addition, as of that date PURDUE has admitted that it had received from its sales force and others "3,200 reports of suspicious doctors and other prescribers". (Attachment 17 (LA TIMES ARTICLE: [U]OxyContin maker closely guards its list of suspect doctors", dated August 11, 2013 by Scott Glover and Lisa Girion). In that article, a PURDUE representative stated that the company did not have "the ability to take the prescription pad out of their hand" and declined to "say precisely how the company decides which cases to refer to authorities". (id).

C. Upon information and belief, since August 11, 2013 PURDUE has not provided to any

federal or state law enforcement or other governmental agency the names and addresses of each doctor it had earlier placed upon its "suspect doctors" list. Furthermore, it has not provided to any law enforcement or other governmental agency the selection criteria it used to determine which of its doctors should be placed on that list. In addition, PURDUE has failed to comply with the provisions of each of the various 2007 Consent Judgments or Settlement Agreements it reached with states such as Vermont, Massachusetts and Rhode Island. (See paragraphs 50 - 51 infra).

     D. Upon information and belief, the INTERNAL SALES DATA obtained by PURDUE and its DEFENDANT DISTRIBUTORS during the years 2001 — 2010 contains data that, among other things, will be sufficient to identify each physician or physician group who were then engaged in the type of illicit "pill mill" operations that had resulted in the widespread "fraud and abuse activities" identified in the September 2009 report prepared by the United States General Accounting Office "MEDICAID Fraud and Abuse related to Controlled Substances Identified in Selected States". (Attachment 18). The data contained in each DEFENDANT'S INTERNAL SALES DATA should, for the years 2001 — 2010, be capable of statistical analysis that will establish by competent evidence each ORIGINAL OXYCONTIN prescription sold or distributed by PURDUE under circumstances that would lead any reasonable pharmaceutical manufacturer or distributor to conclude that the drug was being dispensed for illicit non-medical use and diversion (See, for example, SEVEN MANDATORY REPORTING CRITERIA identified in Paragraph 13 of the 2007 Massachusetts Consent Judgment (See id. Attachment 15, quoted in pertinent part in paragraph 51 infra). Furthermore, each DEFENDANT'S INTERNAL SALES DATA should be sufficient to identify each physician or physician group that dispensed ORIGINAL OXYCONTIN for illicit non-medical use and diversion to persons then residing within each state and county

where that product was distributed within the United States. Such SALES DATA should allow an investigator to determine not only the total number of pills prescribed by a particular physician but also the relative ratio of tablet strength. For example, the Massachusetts physician who prescribed the most OxyContin pills has been shown to have written prescriptions for more than 345 thousand pills, more than 200,000 of which were for pills of the 80 mg strength (almost 60% of all pills prescribed).

E. At all times material from 2001 to 2010, the Defendant Distributors had "actual knowledge of the information" contained in its INTERNAL SALES AND DISTRIBUTION DATA within the meaning of FFCA section 3729 (b) (1) and was therefore compelled to comply with the mandatory reporting obligations set forth in 1971 21 C.F.R. section 1301.71 (a) and 1983 21 CFR 314.80.

F. This reporting obligation was separate and apart from PURDUE'S mandatory reporting and certification obligations set forth in Section V.C. subparts 1 and 2 of the 2007 Corporate Integrity Agreement. (See Attachment 19 at pp 19 — 20 and 29 — 30) ("OIG"). PURDUE's failure to report to the FDA the conclusions its employees had reached (particularly its lawyers who then served on PURDUE's "OFFICE OF GENERAL COUNSEL" (See Attachment 15 Paragraph 13 of 2007 Massachusetts Consent Judgement, paragraphs 50 - 51 infra) constitutes one or more purposeful acts, done "knowingly", to intentionally avoid and evade its obligation to disclose such DATA and, in addition, its obligation to report to the FDA PURDUE's conclusions as to "frequency" in violation of the mandatory reporting obligations established by 1992 21 CFR 314.80. This DATA included but was not limited to reports it had received from its sales force, data supplied to it from IMS Health, and other communications from its" Health Care Providers" (See id., Attachment 15, Paragraph 13 of 2007 Massachusetts Consent

Judgment) pertinent to illicit distribution of its ORIGINAL FORMULATION and frequency of

addiction and over-dose related to such illicit distribution. Furthermore, PURDUE's failure to

report such SALES DATA to the FDA constituted the following: First, ongoing "acts in deliberate

ignorance of the truth or falsity of the information [and] acts in reckless disregard of the truth

or falsity of

[such] information" contained with such SALES DATA in violation of FFCA section 3729 (b) (A)

(ii)— (iii); and, Second, a willful and intentional violation of PURDUE's mandatory reporting and

certification obligations that PURDUE was required to meet pursuant to the provisions of the

2007 Corporate Integrity Agreement with OIG. (See paragraphs 52 - 53 infra).

    42.       Since 2010 PURDUE has continued to market its REVISED FORMULATION. It

sales were about $2.8 Billion in 2011, $2.7 billion in 2012; and 2.46 billion in 2013. Upon

information and belief, its total sales, per year, of its REVISED FORMULATION have averaged

less than 80%

of the sales volume it realized prior to 2010.

    43.       By July 2012 PURDUE had determined, based upon several post-marketing

epidemiological studies, that its REVISED FORMULATION had resulted in noted reductions in

OxyContin's diversion, abuse, and street price and recognized a trend involving abusers'

substitution of other opiates in the place of OxyContin. (See e.g., Attachment 20: (JAMA Intern

Med 2015: 175 (6); 978 — 987: "Rates of Opioid Dispensing and Overdose After Introduction of

Abuse-Deterrent Extended-Release Oxycodone and Withdrawal of Propoxyphene"). The

conclusions reached by this study were confirmed by the significant overall drop in product

sales of PURDUE's REVISED FORMULATION as persons addicted to opiates switched from

the ORIGINAL FORMULATION to heroin or other street drugs. (See Attachment 21: NAEC

WORKING PAPER No. 23031 dated January 2017: "Supply-Side Drug Policy in the Presence of

Substitutes: Evidence from the Introduction of Abuse-Deterrent Opioids" (OxyContin

reformulation significantly reduced non-medical use of OxyContin by as much as 40% (citations

omitted), p 324).

44. In March 2013 PURDUE brought a patent infringement action against Teva

Pharmaceuticals USA, Inc. (the "383 PATENT LITIGATION"). (See paragraph 15 supra). On

January 14, 2014 the Hon. Judge Sidney H. Stein issued Findings of Fact and Conclusions of Law.

PURDUE lost_and appealed that Order that has since been affirmed on appeal. (See in re

Purdue Pharma, 811 F. 3d 1345 at 1348. (Id. Attachment 2).

45. In the patent infringement action, Judge Stein held that PURDUE'S 383 Patent, also

known as the "Thermoforming Patent", was invalid because that Patent: (i) was "anticipated

and obvious" and (ii) "within the state of the art" when that Patent was issued to Grunenthal in

2012. (994 F. Supp. 2d at 421—424). (Id. Attachment 2) (use of high molecular weight

polyethylene oxide to strengthen tablets and make them resistant to crushing was known as

early as 1967) (id. p 426); further, use of hot-melt extrusion as a method to promote

strengthening of tablet was within the state of art as early as 1999 when Feng Zhang, then a

Ph.D. student at the University of Texas, concluded: "[s]ince the polymeric carrier in its melt

state during hot-melt extrusion is pressurized inside the extruder, the hot-melt extrudate is

anticipated to possess a higher physical strength and lower porosity than tablets prepared by

wet granulation and direct compression methods" (id. p 426). (See id., Attachment 9 for copy

of 1999 Zhang article).

46. On December 3, 2002 the U.S. Patent Office issued Patent no. 6,488,963 entitled

'HOT-MELT EXTRUDABLE PHARMACEUTICAL FORMULATION" (the "963 Patent") to the

University of Texas. (Id. Attachment 8). The inventors identified on the 963 Patent were James

W. McGinity and Feng Zhang. On or before 2011 the Texas Board of Regents granted an

exclusive license under the 963 Patent to Abbott Laboratories whereupon Abbott Laboratories

granted an exclusive sublicense to PURDUE. Upon information and belief, PURDUE later

modified its manufacturing procedures to include the HOT-MELT FORMULATION of the 963

Patent that it has employed since that date in the manufacture of its REVISED

FORMULATION as a part of its so-called: abuse-proof tablet". (See paragraph 30

supra).

### SUMMARY OF 2007 FEDERAL CONVICTION FOR MISBRANDING AND RELATED STATE COURT PROCEEDINGS

47. On July 23, 2007 the Hon. Judge James P. Jones agreed to accept a plea agreement

entered into among PURDUE and three of its corporate officers and the United States

Department of Justice whereby PURDUE pled guilty to "misbranding OXYCONTIN, a prescription

opioid pain medication, with the intent to defraud or mislead, a felony under the federal Food,

Drug, and Cosmetic Act, 21 U.S.C.A. Sections 331(a), 333 (a) (2)". (See United States v. Purdue

Pharma Co., 495 F. Supp. 2d at 570—571). (See Attachment 12). That plea agreement was

based upon a certain statement of facts that PURDUE (but not its corporate officers) agreed

were true for the purposes of the agreement:

…"that beginning on or about December 12, 1995 and continuing until

on or about June 30, 2001, certain PURDUE supervisors and employees,

with the intent to defraud or mislead, marketed and promoted OxyContin

as <u>less addictive</u>, <u>less subject</u> <u>to abuse and diversion</u> and <u>less likely</u> to cause

35

tolerance and withdrawal than other pain medications (emphasis added) as

follows:

a. Trained  PURDUE  sales  representatives  [who]...  told  some  health  care
providers

that it was more difficult to extract the oxycodone from an OxyContin

tablet for the purpose of intravenous abuse, although PURDUE's own study

showed that a drug abuser could extract approximately 68% of the

oxycodone from a single 10mg OxyContin tablet by crushing the tablet,

stirring it in water, and drawing the solution through cotton into a syringe;

b. Told PURDUE sales representatives they could tell health care providers
that  OxyContin  potentially  creates  less  chance  for  addiction  than
immediate-release opioids;

c. Sponsored training that taught PURDUE sales supervisors that OxyContin
had  fewer  "peak  and  trough"  blood  level  effects  than  immediate-release
opioids  resulting  in  less  euphoria  and  less  potential  for  abuse  than
shortacting opioids;

d. Told certain health care providers that patients could stop therapy abruptly
without  experiencing  withdrawal  symptoms  and  that  patients  who  took
OxyContin would not develop tolerance to the drug; and

e. Told certain health care providers that OxyContin did not cause a "buzz" or
euphoria, caused less euphoria, had less addiction potential, was less likely
to be diverted than immediate-release opioids, and could be used to

"weed out" addicts and drug Seekers."

36

(See Id. 495 F. supp. 2d at 570 - 571). (Attachment 12).

48.    As a part of the plea agreement, PURDUE and its corporate officers paid a total of about $634 Million in fines including (i) payment of about $100 Million to federal government health care agents under a separate Civil Settlement Agreement dated May 8, 2007 (See Attachment 22, the "2007 FEDERAL SETTLEMENT AGREEMENT") and (ii) a further payment of about $60 Million to various states that elected "to settle their claims" against PURDUE under that AGREEMENT. However, neither the plea agreement accepted by Judge Jones nor the separate Settlement Agreements reached by more than 49 states (See Attachment 23, United States v. Purdue Frederick Co., 963 F. Supp. 2d 561, 565 (U.S. D.C.W.D.Va. 2013) (l) precluded any claim of "restitution other than as set forth in the agreements" or (ii) "capped" any private claim (s) (See Id. 495 F. Supp. 2d at 575 — 576).

49.    Among other things, the 2007 FEDERAL SETTLEMENT AGREEMENT was (i) "intended to be for the benefit of the Parties only [and was not intended to] release any claims against any other person or entity [apart from certain claims PURDUE waived for payment of certain "health care billings"] (See paragraph 14 — 15) (Id. Attachment 22); (ii) applied only to certain 'Covered Claims' against PURDUE involving "conduct with respect to the marketing of OxyContin ...during the time period from 1995 through 2005" (emphasis added) (id. paragraphs C and D of Preamble); (iii) and "expressly excluded (emphasis added) from the scope and terms of this Agreement as to any entity or person ... [including] the following:

   d. Any liability to the United States (or its agencies) for conduct other

   than the Covered Conduct;

   f. Any liability for express or implied claims or other claims for defective

   or deficient products or services, including the quality of goods or

   services; [and]

g. Any liability or claims for personal injury or property damage or for

other consequential damages arising from the Covered Conduct C.]

50.     On May 15, 2007 the Commonwealth of Massachusetts and PURDUE entered into a certain settlement agreement (the "2007 Massachusetts Consent Judgment" (id., Attachment 15). That Judgment was negotiated and entered into by the parties soon after PURDUE entered a plea of guilty to information filed in United States of America v. The Purdue Frederick Company, Inc, et. al. (See id. Attachment 12 supra). That Judgment provided in pertinent part the following:

A. that this judgment shall be governed by the laws of the Commonwealth of

Massachusetts" (id. paragraph 26);

B. that in return for payment of certain unspecified consideration, the Commonwealth

of Massachusetts through its Attorney General "releases and discharges [PURDUE] from any

and all civil actions, claims, damages, costs, attorney's fees or penalties that the Attorney

General could have asserted against [PURDUE] by reason of any conduct that has

occurred at any time up to and including the Effective Date of this Judgment related to or based

upon the Subject Matter of this Judgment ("Released Claims")". (id. paragraph 34). Such

Released Claims, however, were "subject to the limitations and exceptions set forth in

paragraph 36" (id. )...

C. The term ᵁSubject Matter of this Judgment" was defined in the CONSENT JUDGMENT

to mean: ᵁthe investigation under the State Consumer Protection Laws of Purdue's promotional

and marketing practices (See n. 1 of CONSENT JUDGMENT). Massachusetts Consumer

Protection Act; M.G.L. c. 93A et seq. referenced therein.

D. The term the "Effective Date" was defined in the CONSENT JUDGMENT to mean: "the

38

date on that [PURDUE] receives a copy of this Judgment, duly executed [by the parties] and

filed with the Court." (See id. Attachment 1, Definition section, paragraph I.B). The date of

receipt was probably May 1, 2007 when Robins E. Abrams, the Associate General Counsel,

signed the Judgment on behalf of PURDUE. (See id., signature page following page no. 23).

E. Paragraph 36 of the CONSENT JUDGMENT provides in pertinent part the following:

that "[t]he Released Claims set forth in Paragraph 35 specifically <u>do not include</u> the following

claims (emphasis added):

> (a) private rights of action by consumers, provided, however, that this Judgment
>
>    does not create or give rise to any such private right of action of any kind;
>
> (b) claims related to Best Price, Average Wholesale Price or

Wholesale Acquisition Cost reporting practices or Medicaid fraud or Abuse;

> (c) claims of antitrust, environmental or tax liability;
>
> (d) claims for property damage;
>
> (e) claims to enforce the terms or conditions of this Judgment; and
>
> (f) any state or federal criminal liability that any person or entity, including
>
>    Releasees has or may have to the Commonwealth."

51.    Upon information and belief, PURDUE paid the Commonwealth of

Massachusetts the sum of $4,207,450.34 as consideration for signing the CONSENT

JUDGMENT. (See Id.

Attachment 15). In addition, PURDUE agreed for a term of 10 years to the following provisions

of paragraph 13:

A.    that "Purdue shall, no later than thirty (30) business days after the Effective Date of
this Judgment, establish, implement and follow an OxyContin abuse and diversion program

consisting of internal procedures designed to identify potential abuse or diversion of OxyContin in certain settings (the "OxyContin Abuse and Diversion Detection Program )".

B.    that "[t]he Program will apply to Purdue employees and contract or third-part sales representatives ... who contact practicing Health Care Professionals in person or telephone for the purpose of promoting OxyContin".

C.    that "[the] Program directs those persons to report to the Office of General Counsel situations, including, but not limited to the following examples, to the extent that such information or activities are observed or learned by them:

(a) an apparent pattern of an excessive number of patients for the practice type, such as long lines of patients waiting to be Seen, waiting rooms filled to standing-room-capacity, or patient-prescriber interactions that are exceedingly brief or non-existent;

(b) an atypical pattern of prescribing techniques or locations, such as repeated prescribing from an automobile, or repeated prescribing at atypical times, such as after usual office hours when the Health Care Professional is not on call;

(c) information from a highly credible source or several sources (e.g., pharmacists, law enforcement, other health care workers) that a Health Care Professional or their patients are abusing or diverting medications;

(d) sudden, unexplained changes in prescribing or dispensing patterns that are not accounted for by changes in patient numbers or practice type;

(e) a Health Care Professional who has a disproportionate number of patients who pay for office visits and dispensed medication with cash;

(f) multiple allegations that individuals from a particular practice have overdosed; or

(g) unauthorized individuals signing prescriptions of dispensing controlled substances.

D. that "[u]pon identification of potential abuse or diversion involving a Health Care Professional  Purdue will conduct an internal inquiry that will include but not be limited to a review of the Health Care Provider's prescribing history ... and shall take such further steps as may be appropriate under the circumstances that may include ceasing to promote Purdue products to the particular Health Care Professional .... or providing notice of such potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities".

52.    On May 7, 2007 PURDUE and the Office of Inspector General of the Department of

Health and Human Services ('OIG") entered into a "Corporate Integrity Agreement" ("CIA")
that set forth "compliance obligations assumed by Purdue [for a term of five years] unless
otherwise specified". (See Id., Attachment 19, Section ll.A p 1).

A. the Agreement required among other things that PURDUE would appoint a
Compliance Officer [who] shall be responsible for developing and implementing policies,
procedures, and practices designed to ensure compliance with the requirements of this CIA and
with Federal health care program and FDA requirements".

B. The Agreement required that the "Compliance Officer shall be a member of senior
management of Purdue [and] shall make periodic (at least quarterly) reports regarding
compliance matters directly to the Board of Managers of Purdue [and] shall be responsible for
monitoring the day-to-day compliance activities engaged in by Purdue as well as for any
reporting obligations created under this CIA. (See Id., Attachment 19 Section lll.A.1 p 4).

C. The purpose of the Agreement was "to promote compliance [by PURDUE] with the
statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health
care programs as defined by 42 U.S.C. section 1320a — 7b (f). (See Id. Section I p 1).

D. The Agreement, entered into as a part of its 2007 Settlement Agreement with the
United States (See id., Attachment 22, Section I p 1), required PURDUE to adopt certain
"Written Standards" as a "Code of Conduct" for its employees that required "all employees
[to act in] full compliance with all Federal health care and FDA requirements" (See id. Section
lll.B p 5) and further required PURDUE's Compliance Officer to certify in the Company's
"Implementation Report and Annual Reports a certification (i) that "to the best of his or her
knowledge", PURDUE "is in compliance with all of the requirements of the CIA and (ii) that "he
or she has reviewed the Report and has made reasonable inquiry regarding its contents and

believes that the information in the Report is accurate and truthful" (See Id. section V

subsections C.I and C.2).

53. Upon information and belief, at all times material since the date of its CONSENT

JUDGEMENT with the Massachusetts Attorney General's Office, PURDUE has knowingly and

with the intent to deceive failed to provide to "any appropriate medical, regulatory or law

enforcement authorities" ("Appropriate Authorities") relevant portions of its INTERNAL SALES

DATA (See paragraph 36 subparts D — E) that would be "capable of statistical analysis [and]

establish by competent evidence [that the ORIGINAL OXYCONTIN product, particularly its 80

mg tablet] was being dispensed for illicit non-medical use and diversion [and] that the

"frequency" of such illicit diversion and "addiction and over-dose related to such illicit

distribution constituted an "adverse drug experience that [was] both 'serious and

unexpected" due to PURDUE's earlier claims, as stated in its NDA 20-553 that the "controlled

release composition [was] believed to "reduce the abuse liability of the drug". (See Id.

Attachment 4, paragraph 18 of 2007 Agreed Statement of Facts). Further, upon information

and belief, at all times material since the effective date of the 2007 Massachusetts Consent

Judgment, PURDUE has willfully and intentionally failed to provide such information from its

INTERNAL SALES DATA and other related information to any of the following Appropriate

Authorities: any federal agency including but not limited to the CDC, the DEA, the FDA, or the

OIG or any Massachusetts state agency including but not limited to the Department of Health

or the Attorney General's Office or any other local or regional or law enforcement agency.

<u>REQUESTS FOR RELIEF</u>

<u>COUNT ONE: REQUESTS FOR DECLARATORY JUDGMENT RELIEF:</u>

54. Pursuant to Rule 57, F.R.Civ.P., Relator requests a declaratory judgment in his favor:

A.    that the 2007 FEDERAL SETTLEMENT AGREEMENT reached between the Department of Justice and PURDUE (See paragraphs 47 - 49 supra) does not limit or preclude any of the claims for recovery sought by PLAINTIFFS in Counts TWO — EIGHT of this complaint;

B.    that the 2007 CONSENT JUDGEMENT between the Commonwealth of Massachusetts and PURDUE (See paragraphs 50 — 51 supra) does not limit or preclude any of the claims for recovery sought by Plaintiffs in Counts TWO — EIGHT of this complaint;

C.    that the ten-year statute of limitations provided by section 3731 (b) (2) FFCA shall apply to the pending action, with the result that Relator may sue and recover from PURDUE and each other DEFENDANT DISTRIBUTOR for violations of section 3731 (c) FFCA and section 5B MFCA that occurred within 10 years of the date of filing of this complaint, which pursuant to such section, relates back to the date of filing of Relator's original complaint on May 26, 2016 in the Massachusetts federal court action supra. (See United States ex rel. Williams v. City of Brockton, 2016 U.S. Dist. EXIS 178032 [*26 - 27]).

D.    that the six-year statute of limitations provided by Chapter 260 section 2:

1/ should apply to the common law counts (COUNTS THREE, FOUR, SEVEN and EIGHT) and that the date of accrual of such statute should be six years from the date of discovery of the United States' injury (an injury that was "inherently unknowable" in the absence of knowledge of the allegations contained in Counts TWO — EIGHT of this complaint. (See McQuinnes v. Cotter, 591 N.E. 2d 659,662 (Mass. 1992) (See Attachment 24) or four years from date of discovery of the injury asserted in COUNT FIVE and SIX under the Massachusetts Consumer Protection Act ('MCPA") pursuant to the statute of limitations provided by Mass.

43

Gen. Laws Chapter 260 section 93A;

2/ that the beginning of the running of the statute of limitations of such statutes should be held not to have commenced until the date the Relator filed his original complaint in this action, the date when the UNITED STATES and all CO-PLAINTIFF STATES first knew or should have known of the allegations contained in COUNTS TWO — EIGHT; and

3/ that the statutes of limitations set forth in section 2 or section 93A of Chapter 260 should be tolled until the date of filing of Relator's original complaint due to affirmative acts done by PURDUE with the intent to conceal the existence of the United States' causes of action, which concealment constituted a breach of its fiduciary obligation of disclosure required by 1992 21 CFR 314.80, the 2007 Commonwealth of Massachusetts Consent Judgment, and the 2007 Corporate Integrity Agreement.

E. that Massachusetts should apply its own statutes of limitations to this action, which should apply to all state law claims asserted by the federal government, by the Commonwealth of Massachusetts, each other Co-Plaintiff State and Local Government Intervenors under FFCA 3732 (b), and

2/ that under applicable choice of law rules as set forth in section 6 of the Restatement (Second) of Conflicts of Law section 142 (Supp. 1989), the court should apply the law of the forum and rule that the common law claims of the Massachusetts State Plaintiffs should be deemed timely under Massachusetts law. (See Anderson v. Lopez, 80 Mass. App. Ct. 813, 957 N.E. 2d 726 HN 3 - HN 5 (2011) and Petrucci v. Esdaille, 2017 Mass. super. LEXIS 65 / 2017 WL 3080555 (May 31, 2017) [*5] - [*8]); and

F. that the substantive law of the Commonwealth of Massachusetts should apply to Counts Two — Eight of the complaint as brought by the United States and by the

44

Commonwealth of Massachusetts. Further, under the 'functional choice of law approach" followed in Massachusetts, the Court should apply the substantive law of the forum to the claims asserted by the Other Co-Plaintiff States and all Local Government Intervenors. (See McKinney v. National Dairy Council, 491 F. Supp. 1108 1108 (D. Mass. 1980) (HN 2 — HN 4). (See also, Bushkin Assocs. v. Raytheon Co., 473 N.E. 2d 662 (Mass. 1985) (HN 1— 5 generally) and Boston Hides & Furs v. Sumitomo Bank, 870 F. Supp. 1153 (D. Ma. 1994) (HN 2).

## COUNT TWO: REQUESTS FOR DAMAGES UNDER THE FEDERAL AND STATE <u>FALSE CLAIMS ACT:</u>

55.   RELATOR adopts PARAGRAPHS 1-54 as a part of COUNT TWO.

56.   During 2006 — 2016 and at all other times material to this complaint, the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE have processed and made payment to health care providers for numerous prescriptions for the ORIGINAL FORMULATION of OxyContin. As a part of its cooperative venture with the participating states and territories, the federal government, has made payment to such states and territories in an "amount equal to [its share of] the federal medical assistance program percentage [Medicaid Reimbursement Percentage]" (963 F. Supp. 2d at 564) (See Id., Attachment 23).

57.   Upon information and belief, the Medicaid Reimbursement Percentage ("FMAP") in effect for the Commonwealth of Massachusetts during the years 2002 — 2016 was 50% with the result that the federal government reimbursed the Commonwealth for 50% of all OXYCONTIN CLAIMS (including office visits and related health-care services and prescription costs to purchase OxyContin) paid by the Commonwealth during those years. During such

years the Medicaid Reimbursement Percentage in effect for all participating states and

territories varied between a low of 50% and a high of 82% ("PARTICIPATING STATES or

TERRITORIES"). Further, the FMAP ratio for each of the Co-Plaintiff States during those years

varied between a low of 50% (seven states) and a high of 71% (Illinois).

     58.   Upon information and belief, one or more of the following FEDERAL GOVERNMENT

PAYORS made payment for OXYCONTIN CLAIMS submitted to it by PARTICIPATING STATES or

TERRITORIES under the Medicaid Program, established pursuant to Title XIX of the Social Security

Act, 42 U.S.C. sections 1396 — 1396v; the TRICARE Program (f/k/a the Civilian Health and

Medical Program of the Uniformed Services ("CHAMPUS"), 10 U.S.C. sections 1071 — 1110; the

Federal Employees Health Benefits Program ("FEHBP"), which are programs under the

Federal Employees' Compensation Act" ("FECA"); 5 U.S.C. section 810 et seq, the Energy

Employees Occupational Illness and Compensation Act ("EEOICPA"), 42 U.S.C. section 7384 et

seq; and the Black Lungs Benefits Act ("BLBA"), 30 U.S.C. section 901 et seq, administered by

the DOL Office of Workers' Compensation Programs ("OWCP") and/or the Department of

Veterans Affairs ("DVA"). (See Attachment 23: US v. Purdue Pharma Company, Inc., supra, 963

Fed. Supp. 2d at564).

     59.   Upon information and belief, each OXYCONTIN CLAIM paid either by the federal

government or by each PARTICIPATING STATE or TERRITORY including but not limited the

Commonwealth of Massachusetts and each other Co-Plaintiff State was in response to a CLAIM

FOR PAYMENT submitted by a health care provider in such state or territory. Further, each such

CLAIM FOR PAYMENT required a certification that each OXYCONTIN CLAIM involved a medical

visit or service provided by a health care professional that was medically necessary for

treatment of the health care needs of the patient. (See, e.g., Definition of Medical

Necessity, MA REG # 1301 (Attachment 25).

60.   Upon information and belief, PURDUE and each other DEFENDANT DISTRIBUTOR had actual knowledge through their INTERNAL SALES DATA and other related information (maintained to provide PURDUE with sales information involving physician profiles and their prescribing practices) that a significant number of their physician-customers were engaged in an illegal enterprise whereby they wrote prescription slips and/or purchased for illicit distribution vast quantities of the ORIGINAL FORMULATION for diversion to persons then addicted to OxyContin or to their suppliers. (See paragraph 36.A — 36.E supra).

61.   Upon information and belief, on or before 2002 PURDUE "had identified hundreds of doctors who were prescribing OxyContin recklessly" (See Attachment 26, Pacific Standard article dated March 4, 2015 by Mike Mariani, "How the American opiate epidemic was started by one pharmaceutical company" p 5 — 6). Further, during such time, PURDUE as "applicant" under 21 C.F.R. section 314.80 and as "registrant" and PURDUE and each other DEFENDANT DISTRIBUTOR as "distributor" under 21 C.F.R. section 1307.71 (a) had the mandatory obligation to disclose to the FDA and the DEA its knowledge of such illicit practices and the names of the physicians ("Suspect Physicians") and pharmacies ("Suspect Pharmacies") it knew were then engaged in such practices. (See n. 3 — 10 supra).

62.   Upon information and belief, PURDUE and each other DEFENDANT DISTRIBUTOR did not disclose the information they had obtained from their INTERNAL SALES DATA and other related information to either the FDA or to the United States Drug Enforcement Administration ("DEA") or the DEA Office of Diversion Control prior to July 23, 2007 when Judge Jones accepted the plea bargain agreement between PURDUE and the Department of Justice (See paragraphs 47 — 49 supra) or at any time thereafter through the date of the original complaint).

63.     Instead, PURDUE and each other DEFENDANT DISTRIBUTOR undertook, during the

years 2002 — 2010, to actively promote and sell and/or distribute its ORIGINAL FORMULATION

to providers whom PURDUE had identified as physicians who were "recklessly" prescribing

OxyContin to Medicaid patients under circumstances that indicated that most, if not all, of

the distributions and sales to this group were being written for purposes of illicit product

diversion of a Class II controlled substance, a known violation of MA REG # 1301 supra and

related Medicaid regulations of the Co-Plaintiff States. (See Id. Attachment 25). (See paragraphs

36.A-36.E supra). PURDUE and each DEFENDANT DISTRIBUTOR therefore had actual

knowledge that physicians identified on its or their INTERNAL SALES DATA had engaged, and

continued to engage, in the preparation and submission of false claims for payment in violation

of MA. REG.#1301 supra and related federal and state regulations. (See paragraph 10 supra).

64.     Further, PURDUE and each DEFENDANT DISTRIBUTOR had actual knowledge from

their INTERNAL SALES DATA that the SUSPECT PHYSICIANS and/or SUSPECT PHARMACIES each

had identified were over-prescribing the ORIGINAL FORMULATION of OxyContin and then

engaged in a variety of "pill mill" illegal enterprises. (See, e.g., illicit schemes to defraud

Medicaid identified in U.S. v. Jackie Mize et al, 2012 WL 75440 (6th Cir. 2016). (See Attachment

27). Furthermore, PURDUE knew or had the opportunity to know that each other DEFENDANT

DISTRIBUTORS had either failed to report to the DEA "suspicious orders" (See n. 8 supra) or had

willfully falsified the pharmacy orders filled by such DISTRIBUTORS in violation of the

mandatory reporting obligations of 21 C.F.R. section 1301.77.

65.     PURDUE and each other DEFENDANT DISTRIBUTOR's knowledge of such

activities by their SUSPECT PHYSCIANS and/or SUSPECT PHARMACIES, coupled with such

DEFEENDANTS' continuing efforts to distribute additional supplies of its ORIGINAL

FORMULATION to such groups, constitutes ample proof that at all times material during

the years 2002 — 2010, PURDUE and each other DEFENDANT DISTRIBUTOR had engaged

in the commission of a conspiracy in violation of 18 U.S.C.A. section 371 and FFCA section

3729 (a) (1) (c). This conspiracy involved, among other things, the operation of an illegal

enterprise whereby PURDUE and each other DEFENDANT DISTRIBUTOR knowingly placed

into the stream of commerce vast quantities of ORIGINAL FORMULATION for illicit

consumption by thousands of

Americans then addicted to that product in violation of 21 U.S.C. section 823 (b) and (e). This

conspiracy continued even after the FDA requested PURDUE to remove its product PALLADONE

from the market due to "drug-dosing" concerns in 2005. (See Attachment 28: Statement of

Robert J. Meyer, Director of Office of Drug Evaluation Il, re "FDA's Role in Preventing

Prescription Drug Abuse", presented to U.S. House of Representative's Committee on

Governmental Reform on September 13, 2005 at pp 285 — 285): Palladone suspension ordered

by FDA after initial approval based upon "new evidence ... that current formulation [of this Class

Il opioid] presented an unacceptable level of risk").

66.     Relator asserts that each sale or distribution of ORIGINAL FORMULATION to

providers and/or pharmacies PURDUE and each other DEFENDANT DISTRIBUTOR had

identified as a SUSPECT PHYSICIAN and/or SUSPECT PHARMACY in their INTERNAL SALES

DATA constituted a purposeful act that resulted in and "caused to be made" the

submission of numerous false claims for payment to the UNITED STATES, the

COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE in

violation of section 3729 (a), subparts (a) (B) and (a) (C) FFCA and section 5B (a) MFCA and

related sections of each CoPlaintiff's FCA statute. Relator therefore Seeks as damages on behalf such PLAINTIFFS the following:

A.     Payment of a civil penalty in the amount allowed pursuant to sections 3729(a) FFCA and 5B (a) MFCA and/or three times the amount of actual damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS, and each OTHER CO-PLAINITFF STATE for for each act constituting a violation of such sections and

B.     All reasonable costs of attorneys' fees, expert fees and all costs of investigation, penalty or damages ", as allowed pursuant to section 3730 (d) FFCA and/or section 5B (a) MFCA and related section of each Co-Plaintiff's FCA statute.

## COUNT THREE: REQUESTS FOR DAMAGES ARISING UNDER RESTATEMENT (SECOND) OF TORTS section 402A (1965):

67.     RELATOR adopts adopt PARAGRAPHS 1-66 as a part of COUNT THREE.

68.     PURDUE and each DEFENDANT DISTRIBUTOR, as manufacturer and/ or distributor of the ORIGINAL FORMULATION, are strictly liable to PLAINTIFFS for the property damages each incurred as asserted supra in paragraphs 37.A — 37.E. These damages include PLAINTIFFS' TOTAL SPENDING for SUBSTANCE ABUSE and ADDICTION for the years 2002 - 2010 for addiction caused by or related to the ORIGINAL FORMULATION, as apportioned by the ratio of GROSS SALES PER YEAR OF THE ORIGINAL FORMULATION divided by the GROSS SALES PER YEAR OF ALL OTHER OPIATE CLASS II PHARMACEUTICAL PRODUCTS SOLD TO US RESIDENTS DURING SUCH YEARS.

69.     During 2002 — 2010 and at all times material to this complaint, PURDUE and the

DEFENDANT DISTRIBUTORS sold and/or distributed a class II opioid product (the ORIGINAL

FORMULATION of OxyContin) to thousands of persons then in all US states and territories

including the Commonwealth of Massachusetts and each other Co-Plaintiff State while

such product was in an unreasonably dangerous and defective condition. When sold, each unit

of the ORIGINAL FORMULATION was defective because when sold or distributed to residents of

all US states and territories, the pill matrix of the ORIGINAL FORMULATION lacked sufficient

physical or chemical hardness to prevent inadvertent or deliberate tampering of the tablet with

the result that the product was unsafe for its intended use to treat patients with complaints of

"moderate to severe pain" over a course of treatment "for more than a few days" (See NDA 20-

553, id. Attachment 1; See paragraphs 15 — 16, and 20 — 24 supra) because:

 A. the dosage of oxycodone (the active opioid ingredient of the ORIGINAL

FORMULATION) was "approximately twice as potent as oral morphine on a milligram basis"

(See paragraph 22 supra);

 B. The ORIGINAL FORMULATION "combined several doses worth of oxycodone — a

powerful opioid -- into a single tablet [that was intended to release] the oxycodone over a

twelve-hour extended release profile" (See 383 PATENT LITIGATION, 994 F. Supp. 2d at 414).

(See id. Attachment 2). This release mechanism, however, "was susceptible to tampering, since

abusers could crush the tablets easily into powder, which resulted in the time release aspect of

the formulation being destroyed and the opiate being released at once" (Id. Attachment 2).

 C. In its NDA-20553 PURDUE claimed that "the safety and effectiveness of its ORIGINAL
   FORMULATION was dependent upon the time-release mechanism of its product, that

PURDUE stated was "believed to reduce the abuse liability of [its product]". When it made that

claim, PURDUE knew that the "wet granulation and direct compression methods" it had

employed to construct its pill matrix (See paragraph 45 supra) rendered the product

51

susceptible to tampering by persons addicted to opiates.

D. In 1995 when it filed NDA-20553, PURDUE knew or had reason to know that "abusers

could crush the [ORIGINAL FORMULATION] tablets easily into powder [with the result that] the

opiate [would be] released at once" (See 383 LITIGATION, 994 F. Supp. at 414 (Id. Attachment

2). (see paragraph 26 supra). See 2007 AGREED STATEMENT OF FACTS, wherein PURDUE

admitted that its "...own study showed that a drug abuser could extract approximately 68% of

oxycodone from a single 10mg OxyContin tablet by crushing the tablet, stirring it in water, and

drawing the solution through cotton into a syringe" (See id. Attachment 4 p 6);

E. In February 1999 PURDUE became aware that more than a dozen patients in clinical

studies it had funded had developed symptoms [U] possibly related to opioid withdrawal" while

using the ORIGINAL FORMULATION (see 2007 AGREED STATEMENT OF FACTS, paragraphs 30 -
35; Id. Attachment 4 pp 10 — 12);

     F.     Prior to February 1999 PURDUE "investigated ways to reformulate OxyContin to
deter

abuse". This in-house effort occurred after PURDUE "had begun to develop abuse-deterrent

technologies in the 1990's" when PURDUE had "focused on addressing other frequently abused

drugs besides OxyContin [and] other methods of abuse besides snorting and injecting" (See 383

PATENT LITIGATION, 994 F. supp. 2d at 415) (Id. Attachment 2).

     G.     In 2001 PURDUE's "research and development team" made the decision to
develop

"a tablet that would be difficult to crush or to syringe" (See 383 PATENT LITIGATION, 994 F.

Supp. 2d at 415). (See paragraph 39 supra). As of this date PURDUE then knew that its

ORIGINAL FORMULATION did not contain a suitable "controlled release mechanism" that was

intended to prevent "parenteral, nasal and/or oral abuse of [the] pharmaceutical active ingredients [of its product and its] abuse potential". (See 383 Patent, p 2, claim No. 30). (Attachment 6; paragraph 26 supra);

H.     In 2004 or before PURDUE became aware of certain technology that "had been developed and patented by Grunenthal GmbH, a German company, of a tamper-proof, crushresistant tablet" (See id. 994 F. Supp. 2d at 415 and paragraph 39 supra). In this effort, PURDUE knew or had reason to know that other pharmaceutical companies or university-funded researchers in the field of pill matrix design and construction had begun to use "high molecular weight polyethylene oxide to strengthen tablets and make them resistant to crushing" (See paragraph 45 supra) and that several of these researchers claimed that their "hot-melt extrusion" process was capable of producing "higher physical strength and lower porosity tablets [than those] tablets prepared by wet granulation and direct compression methods"

(See paragraph 45 supra for description of 1999 Zhang publication).

l. In 2007 PURDUE submitted NDA-022272 to the FDA. By this date PURDUE had acquired from Grunenthal GmbH a license to use its "abuse-proof formula" (See paragraph 27 supra). The FDA approved that NDA in 2010, provided that PURDUE "conduct epidemiological studies to address whether the changes [the REVISED FORMULATION] actually resulted in a decrease in the risks of misuse and abuse, and their consequences" (Id).

J. By acquiring licensing rights to Gruenthal's "ABUSE-PROOFED DOSAGE" patent (the 383 PATENT). (See paragraph 27 — 29 supra), PURDUE acquired for the first time the ability to produce an "extremely hard" tablet sufficient in design and construction to prevent crushing or injecting of the product. This was a necessary first-step toward developing an abuse-proof

53

tablet (Id.). Thereafter, PURDUE obtained a separate license to use the "hot-melt extrusion process" that researchers had first developed in 1995. In their 1999 patent application, these researchers claimed that their process was "particularly well suited for oral delivery ... [of] ...controlled-release pharmaceutical formulations" (See paragraph 30 supra).

K. In August 2010 PURDUE discontinued production of its ORIGINAL FORMULATION and Limited further production to its REVISED FORMULATION it began to distribute after the supplies of its ORIGINAL FORMULATION had run out.

L. In July 2012 or before PURDUE had determined, based upon its post-marketing studies, that its REVISED FORMULATION had resulted in noted reductions in diversion, abuse, and street price of its new product, and recognized a trend involving abusers' substitution of other opiates including heroin as a substitute for its ORIGINAL FORMULATION.

70. At all times material between 1995 and 2010, PURDUE had actual knowledge that its ORIGINAL FORMULATION lacked the necessary hardness to prevent or substantially reduce the risk that persons addicted to opiates would use it to further their addiction. (See paragraph 20 — 25). PURDUE therefore had the duty to foresee that a vast number of users of its product would crush the tablet and use it as a ready and easily available source of opiates to further their addiction. Furthermore, the INTERNAL SALES DATA and other related information that PURDUE and its distributors received after 2001 demonstrated that numerous physicians and/or physician groups were then engaged in illicit "pill mill" operations that involved widespread "fraud and abuse activities", as identified in the September 2009 GAO report (See id. Attachment 18).

71.     At all times material between 1995 and 2010, the ORIGINAL FORMULATION was defectively designed and unsafe for its intended use because it lacked the hardness needed to avoid widespread use by addicts as a ready source of opiates to further their addiction:

A.     In 1995 when it submitted NDA-20553 to the FDA, PURDUE then knew or should have known that its ORIGINAL FORMULATION lacked the hardness required to prevent addicts from crushing the product in order to obtain a ready source of opiates to further their addiction (See paragraph 69, subparts [A] — [D]);

B.     In 1999 PURDUE received reports that patients in its clinical trials had developed symptoms of opiate addiction while under the care of physicians then supervising PURDUE'S trials (See paragraph 69, subpart [E];

C.     By 2001 PURDUE through its research and development team knew that the ORIGINAL FORMULATION was defective because it lacked a suitable "controlled release mechanism" and further knew that this defect had resulted in wide-spread reports of addiction caused by addicts who crushed that product for purposes of obtaining ready sources of opiates to further their addiction (See paragraph 69 [F]);

D.     In 2001, if not before, PURDUE had actual knowledge through its SALES AND DISTRIBUTION DATA and other related information that numerous physicians and/or physician groups were then engaged in illicit 'pill mill" operations, and continuing to purchase or write scripts to their patients of the ORIGINAL FORMULATION for off-label uses of that product (See paragraph 41.A — 41.F supra);

72.     PURDUE'S negligent failure to research and design a revised pill matrix prior to 2004 when it obtained a license to use Grunenthal's "ABUSE-PROOFED DOSAGE FORM" (See paragraphs 27- 28 supra) and further failure to restrict its marketing and distributing of its

55

ORIGINAL FORMULATION until such time that it could design or acquire the licensing rights to use the Grunenthal 383 PATENT was a proximate cause of the public health epidemic that began shortly after marketing of the product in 1996 and exponentially worsened prior to 2001 when PURDUE first took steps to design and construct "an abuse-proof tablet" (See paragraph 29 supra).

A.    During such time, the epidemic worsened as PURDUE's annual product sales grew to more than $3.0 billion per year (See paragraph 19 supra).

B.    During such time, PURDUE failed to follow then-recognized and accepted state of the art practices known to and employed by competitors within the pharmaceutical industry related to the design and construction of a pill matrix intended to be used as a controlled release platform of an opiate medication then classified as a Class II pharmaceutical product.

C.    Such failure was negligent as contrary to the standards of reasonable care then practiced within the domestic and international pharmaceutical industry. This failure constituted a proximate cause of the public health epidemic created by sales of the ORIGINAL FORMULATION to pharmacies located throughout the United States. This failure required federal, state and local governments to expend vast sums of tax payer funds that were and have been required to protect their public's health and safety. (See paragraph 37 supra).

73.    In addition, PURDUE and each DEFENDANT DISTRIBUTOR should be held strictly liable without regard to proof of fault for its defective design and construction of the ORIGINAL FORMULATION:

A.    In its NDA 20-553 PURDUE claimed that its ORIGINAL FORMULATION would "provide increased convenience in dosing appropriate patients" and stated in its proposed labeling that its product would provide "for the management of moderate to severe pain in

patients where use of an opioid analgesic is indicated for more than a few days". The FDA

approved this NDA on December 12, 1995 (See Attachment 1 p 1) by stating we "have

concluded that adequate information has been presented to demonstrate that the drug

product is safe and effective for use as recommended in the enclosed draft labeling".

B.      On September 18, 1996 the FDA approved NDA 20-553/S-056, which PURDUE had

submitted in connection with its request to market an 80 mg tablet. In its submission, PURDUE

claimed that its clinical studies indicated that "there appears to be no obvious clinical problems

with the new dosage strength [80mg]". (See Attachment 1 p. 1).

C.      In NDA 20-553 PURDUE identified its 042 PATENT (See Attachment 5, See

paragraph 26 supra). In that PATENT PURDUE identified several types of coatings it intended to

use in order to create a "controlled release mechanism" but failed to identify any physical or

chemical that it expected would prevent "parenteral, nasal and/ or oral abuse of [the]

pharmaceutical active ingredients [of its product and its] abuse potential" (See paragraph 16,

claim set forth in 383 PATENT). (See Attachment 6 supra).

D.      In NDA 20-553 PURDUE claimed that its researchers stated their belief that the

product's time-release mechanism would "reduce the abuse liability" of the product even

though they then knew that their product (i) was "approximately twice as potent as oral

morphine on a milligram basis" (See paragraph 22 supra); (ii) then contained "several doses

worth of oxycodone — a powerful opioid — into a single tablet" (See paragraph 36 supra); and

(iii) and would allow a drug abuser to "extract approximately 68% of oxycodone from a single

10mg OxyContin tablet by crushing the tablet, stirring it in water, and drawing the solution

through cotton into a syringe" (See paragraph 47.a supra).

57

E.  In 1999 PURDUE learned that more than a dozen patients in one of its clinical studies had developed symptoms "possibly related to opioid withdrawal" (See paragraph 69 [E] supra). That same year PURDUE took steps to investigate "ways to reformulate OxyContin to deter abuse" (See paragraph 69 subpart G supra).

F.  In 2001 PURDUE made the decision to develop "a tablet that would be difficult to crush or to syringe" (See paragraph 69 subpart G supra).

G. In 2004 PURDUE became aware of the Grunenthal GmbH process for producing a "tamper-proof, crush resistant tablet" and took steps thereafter to acquire licensing rights to Gruenthal's 383 PATENT (See paragraph 69 subpart H supra).

H. In 2010 the FDA approved NDA 022272. PURDUE had filed this NDA in 2007. This filing pertained to "an abuse-proof formulation", the REVISED FORMULATION. In 2013 PURDUE obtained from the FDA approval of new labelling that allowed it to claim that its new product contained an abuse-proof formula "for treatment of moderate-to-severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time" (See Attachment 10 p 1).

74. For reasons set forth in paragraph 69 PURDUE and each DEFENDANT DISTRIBUTOR should be held strictly liable without regard to proof of fault for the various design defects it failed to correct prior to distributing the ORGINAL FORMULATION in 1996 and through 2010 when such DEFENDANTS began to distribute its REPLACEMENT FORMULATION:

A. In 1996 PURDUE had actual knowledge that the pill matrix of its ORIGINAL FORMULATION lacked the physical or chemical hardness necessary to prevent product misuse by persons intending to crush the tablet in order to overcome the product's time-release

mechanism and release "at once" the full strength of the narcotic then present within the tablet (See paragraphs 20 — 21 supra);

B. In 1996 PURDUE had conducted certain in-house research that had "focused upon other frequently abused drugs ... and other methods of abuse besides snorting and injecting" (See paragraph 69 subpart F). From this research PURDUE knew or should have known that its claim, as stated in NDA 2- 553, that its "twelve-hour release profile" would "reduce the abuse liability of [its product] was unfounded and contrary to the in-house crushing tests it had earlier conducted (See paragraph 69 subpart C supra);

C. In 2001 PURDUE made the decision to develop "a tablet which would be difficult to crush or to syringe" (See paragraph 69 subpart G). As of this date PURDUE knew or should have known (i) that other pharmaceutical manufacturers of time-release products including but not limited to products containing opioid analgesic medications had begun to "use high molecular weight polyethylene oxide to make [their products] resistant to crushing" (See paragraph 45 supra) and (ii) that the "hot-melt extrudate" process developed by University of Texas researchers in 1999 rendered obsolete prior methods of producing opiate time-release by "wet granulation and direct compression methods" See paragraph 45 supra).

D. By 2002 PURDUE had actual knowledge through its INTERNAL SALES DATA and related information (See paragraphs 41.A — 41.F supra) that a substantial quantity of its ORIGINAL FORMULATION product had been "recklessly" prescribed by hundreds of its physician-customers who were engaged in an illegal enterprise when they wrote prescription slips and/or purchased for illicit sale vast quantities of the ORIGINAL FORMULATION for diversion to persons then addicted to OxyContin or their suppliers.

59

E.     In 2004 PURDUE became aware of the Grunenthal patent application and manufacturing technology involving the 383 PATENT for an "abuse-proof formulation" (See paragraph 27 supra). PURDUE obtained licensing rights for this technology and three years later filed NDA 022272 (id.). In 2010 the FDA granted approval of PURDUE's NDA and allowed PURDUE to market its REVISED FORMULATION but required it to conduct certain epidemiologic studies to evaluate whether the REVISED FORMULATION would demonstrate suitable "abusedeterrent properties". In 2013 the FDA authorized PURDUE to revise its labeling for the new product and market its product as having such properties. (See paragraph 31 supra).

F.     By 2011 PURDUE acquired a license to use the 963 PATENT earlier patented by University of Texas researchers in 2002. That PATENT pertained to the "hot-melt extrusion process" that the researchers had first published in 1997 and described as "particularly well suited for oral delivery ... [on... controlled release pharmaceutical formulations" (See paragraph 30 supra).

G. In 2001 if not before, PURDUE knew or should have known of the existence of the 963 PATENT and should have then pursued a licensing agreement in order to obtain the right to use that process in the manufacture of its REVISED FORMULATION.

75.     Relator asserts that it was economically and scientifically feasible for PURDUE to have developed or acquired the technology it used to develop its REVISED FORMULATION prior to 2002, the date when PURDUE had actual knowledge that its "ORIGINAL FORMULATION was subject to wide-spread abuse and that several hundred or more of its prescribing physicians were then acting recklessly and illegally prescribing its ORIGINAL

FORMULATION product for distribution to addicts or their suppliers" (See paragraph 36.D supra).

76.     Relator Seeks to recover on behalf of each PLAINTIFF its TOTAL SPENDING for SUBSTANCE ABUSE and ADDICTION that was caused by and related to PURDUE'S sales and distribution of ORIGINAL OXYCONTIN during the years 2002 — 2010. As a proximate result thereof, PURDUE and each DEFENDANT DISTRIBUTOR as "applicant" and/or "registrant" (See. n. 4 and n. 10 — 11) should be liable to each PLAINTIFF for that PLAINTIFF'S actual and punitive damages, as follows:

A.     the amount of actual and consequential damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS, each OTHER CO-PLAINTIFF STATE and each LOCAL GOVERNMENT INTERVENOR for the years 2002 - 2010 as a part of their spending on SUBSTANCE ABUSE and ADDICTION for or on behalf of persons addicted to ORIGINAL OXYCONTIN, that such expenditures are separate and apart from the health care services and products it paid as a part of its MEDICAID REIMBURSEMENT PROGRAM. This amount, upon information and belief, exceeded the sum of $500 million per year during each year from 2002 to 2010. (See Attachment 29: Summary of Federal Spending on Substance Abuse and Addiction for 2005, Table 3.1 at p 20 of May 2009 Report of National Center on Addiction and Substance Abuse).

B.     the amount of actual damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for the years 2002- 2010 Medicaid for false claims submitted for payment by PURDUE and each other DEFENDANT DISTRIBUTOR's Suspect Physicians in violation of MEDICAID MEDICAL NECESSITY STANDARDS (See paragraph 10 supra) and

C.      punitive damages equal to three times the actual damages sustained by each such PLAINTIFF during those years.


## COUNT FOUR: REQUEST FOR DAMAGES UNDER EQUITABLE DOCTRINE OF <u>UNJUST ENRICHMENT</u>:

77.     RELATOR adopts PARAGRAPHS 1-76 as a part of COUNT FOUR.

78.     PURDUE and each DEFENDANT DISTRIBUTOR have been unjustly enriched by the gross revenues and profits each DEFENDANT has received as a result of the sale and distribution for sale of the ORIGINAL FORMULATION to US consumers between 1996 and 2010.

79.     Upon information and belief, PURDUE and each DEFENDANT DISTRIBUTOR have sold or distributed for purposes of sales more than 50 million ORIGINAL FORMULATION tablets and have realized gross sales during those years in an amount in excess of $25 billion. During such years PURDUE and each DEFENDANT DISTRIBUTOR have manufactured or distributed for purposes of sale within the United States millions of prescriptions of its ORIGINAL FORMULATION. These prescriptions that amount to more than 50 million tablets of defective product sold to US consumers, are a proximate consequence of the public health epidemic that began in 1996 and grew exponentially before PURDUE replaced that product in 2010 with its REVISED FORMULATION (see paragraph 40 supra).

80.     In 2001 PURDUE's "research and development team" made the decision to develop "a tablet that would be difficult to crush or to syringe" (383 PATENT LITIGATION, quoted supra paragraph 39), a decision it made after it became aware through its INTERNAL SALES DATA and other related information that "a significant number of [its] physician-customers were engaged in an illegal enterprise when they wrote prescription slips or purchased vast quantities of the ORIGINAL FORMULATION for illicit diversion to persons then addicted to OxyContin or their suppliers" (See paragraph 17 supra). Notwithstanding such knowledge,

PURDUE undertook during the years 2001 — 2010 "to actively promote and distribute its ORIGINAL FORMULATION to providers it had identified as physicians who were "recklessly" prescribing OxyContin to Medicaid patients under circumstances that indicated that most, if not all, of the distributions and sales to this group were being written for purposes of illicit product diversion of a Class II controlled substance in violation of applicable Medicaid Rules and DEA statutes and regulations

(See n.l — 8 supra). Such efforts after 2001 constitute knowing participation in "a variety of 'pill mill' activities in violation of 18 U.S.C.A. section 371 (id).

81.     At all times material between 1995 and 2010, PURDUE knew as a result of its own tests that its ORIGINAL FORMULATION could be easily crushed with the result that the opiate contained in its tablet would be "released at once". (See paragraph 69, subparts C - D):

A.     By 2004 PURDUE had actual knowledge of the Grunenthal GmbH "abuse-proof formula". (See id. subparts I —J);

B.     By 2004 PURDUE knew or should have known that its competitors had developed various physical and chemical methods whereby they were able to produce "tamper-proof and crush-resistant" tablets for use in the manufacture of "controlled release" pharmaceutical products. (See paragraph 69 subparts A- B).

C.     By 2004 PURDUE knew or should have known that the "hot-melt extrudate" process would render "obsolete prior methods of producing opiate time-release tablets by 'wet granulation and direct compression methods"'. (See paragraphs 45 and 69 subpart C).

82.     Upon information and belief, PURDUE sold more than $15 billion of its ORIGINAL FORMULATION to US consumers during 2004 — 2010. Further, during such time, PURDUE knew or had reason to know that a substantial quantity of that product had or would be diverted for illicit use. (See paragraph 17 supra).

83.    PURDUE's failure to manufacture and sell a "tamper-proof and crush resistant tablet" (paragraph 69 subpart H supra) after 2004 and until 2010 when it began to sell and distribute its REVISED FORMULATION constitutes negligence "as contrary to the standards of reasonable care then practiced within the domestic and international pharmaceutical industry" .(See paragraph 69 subpart C). Further, for reasons stated in paragraph 69 subparts A— G, PURDUE and each DEFENDANT DISTRIBUTOR should be held strictly liable without regard to fault for its knowing and repeated sales of a defectively designed product prior to 2010, the date when it first began to distribute its REVISED FORMULATION and the knowing and willful failure of PURDUE and the DEFENDANT DISTRIBUTORS to comply with the mandatory reporting obligations set forth in 21 C.F.R. section 1301.77 (See n. 3 supra).

84.    Furthermore, during such time PURDUE and each OTHER DEFENDANT DISTRIBUTOR knew and had reason to know as "registrant" (See n. 9 supra) that the ORIGINAL OXYCONTIN product each sold or distributed to their SUSPECT PHYSCIANS and SUSPECT PHARMACIES were subject to ongoing wide-spread illicit diversion and abuse and that many of its retail customers had filled prescriptions for persons who were addicts or suppliers of addicts. (See paragraph

41.A -41.F supra).

85.    Under principles of equity, PURDUE and each DEFENDANT DISTRIBUTOR should be required to disgorge all profits that it has unjustly realized as a consequence of        .the sales and/or distribution each realized from the ORIGINAL FORMULATION after June 2004. See Restatement (Third) of Restitution and Unjust Enrichment section 3, comment c (2011) (restitution requires full disgorgement of profit by a conscious wrongdoer). Further, PURDUE should be required to assign to Relator for subsequent assignment by Relator to a federal or

private not-for-profit university and/or research facility all of its current patents or licenses to

use patents owned by third-parties that relate to its ORIGINAL FORMULATION or

REPLACEMENT FORMULATION for possible construction of a tapered-dosage opioid tablet for

use by health care providers in the treatment of persons now addicted to heroin and other

forms of opioids.

## COUNT FIVE: REQUEST FOR DAMAGES AND INJUNCTIVE RELIEF AGAINST PURDUE PURSUANT TO THE MASSACHUSETTS CONSUMER PROTECTION ACT ("MCPA") MGL ch. 93A seq.)

86.     RELATOR adopts PARAGRAPHS 1-85 as a part of COUNT FIVE.

87.     At all times material between 2002 and 2010 PURDUE actively solicited and sold

and distributed for purposes of sale to physicians and pharmacies then located within the

Commonwealth of Massachusetts and each Other Co-Plaintiff vast quantities of its ORGINAL

FORMULATION product after it had actual knowledge that a substantial portion of such sales,

particularly sales of its 80 mg tablet, were being made to physicians whom PURDUE had

earlier identified and placed on their list of "Suspect Physicians" (See paragraph 34 supra).

This data was contained in its INTERNAL SALES DATA and other related information that had

been obtained by the PURDUE sales force and from IMS Health, a third-party information and

technical services company then doing business with PURDUE. From such DATA and other

information. PURDUE knew and had reason to know of the actual prescription patterns

followed by each Suspect Physician or each Suspect Pharmacy. (See paragraph 41A — 41.E

supra) and therefore knew and had the opportunity to determine from such DATA and other

related information that of its Suspect Physician or Suspect Pharmacy Customer was then

actively engaged in the illegal prescription and dispensing of ORIGINAL OXYCONTIN for

purposes of illicit non-medical use and diversion to persons then addicted to opioids or their

suppliers.

88.    During such time PURDUE as "registrant" knowingly and with the intent to

deceive failed to disclose to the FDA, the DEA or other federal or state public health or law

enforcement agencies located within the Commonwealth of Massachusetts or each other

CoPlaintiff State or elsewhere that it had actual knowledge that several hundred or more of its

Suspect Physicians and Suspect Pharmacy Customers were "recklessly" and illegally prescribing

its ORIGINAL FORMULATION product, particularly the 80 mg tablet, for distribution to addicts

or their suppliers. PURDUE continued its deception even after the Commonwealth of

Massachusetts and Other Co-Plaintiff States and other states obtained CONSENT JUDGMENTS

that required PURDUE to identify and report to governmental officials physicians who PURDUE

and its sales force believed were engaged in "atypical patterns of prescribing" as described in

the "SEVEN MANDATORY REPORTING CRITERIA" identified in the 2007

Massachusetts Consent Judgment (See paragraph 41 supra). This failure among other things

constitutes a willful and intentional failure on the part of PURDUE to comply with the reporting

and certification requirements of the Corporate Integrity Agreement it signed with OIG in 2007

(See paragraphs 41.E and 52 — 53 supra) and the mandatory reporting obligations of 21 C.F.R.

section 1301.77. (See n. 6 — 8 supra).

89.    During such time PURDUE as "applicant" knowingly and with the intent to

deceive failed to comply with the mandatory reporting obligations set forth in 1992 21 CFR

314.80, specifically, the frequency" of illicit abuse and distribution and resulting "serious and

unexpected" adverse drug experience that increased to epidemic proportions within five years

after it received approval by the FDA of NDA 20 — 553 in 1995. (See n. 3 — 5 supra and See

paragraphs 41.A — 41.B.)

90.     During such time PURDUE knowingly and with the intent to deceive continued to

sell and distribute ORIGINAL FORMULATION to its Suspect Physicians and Suspect Pharmacies

then located within the Commonwealth of Massachusetts and elsewhere even though it then

knew or should have known from its INTERNAL SALES DATA and other related information that

a majority of such sales were paid for by Medicaid as a part of an illegal conspiracy by such

Physicians or Pharmacies to obtain payment by Medicaid through submission of false claims in

violation of the Medicaid Medical Necessity Standards. (See paragraph 10 supra).

91.     In addition, PURDUE's knowing and active participation in the illicit sale and

distribution of ORIGINAL OXYCONTIN to its Suspect Physicians and Suspect Pharmacies

furthered that illegal conspiracy by among other things PURDUE's intentional failure to comply

with the mandatory reporting obligations set forth in 21 CFR 314.80 and 21 C.F.R. 1307.71, in

the 2007 Massachusetts Consent Judgment and in the 2007 Corporate Integrity Agreement.

92.     Such failures by PURDUE constitute knowing and purposeful omissions of

material information that misled the FDA, the OIG and related state public health authorities in

the exercise of their duties to protect the public from harm arising from the illicit sale and

distribution of Class II narcotic drugs to addicts and their suppliers. Such willful acts should

constitute among other things unfair and deceptive acts or practices in MCPA ch. 93A section 2

and related sections of each Co-Plaintiff's CPA. As a proximate cause thereof, PURDUE is liable

to the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER

COPLAINTIFF STATE under such statutes for ACTUAL AND PUNITIVE DAMAGES, as follows:

A.      the amount of actual and consequential damages sustained by the UNITED

STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF

STATE for years 2002-2010 as a part of each such PLAINTIFF'S spending on SUBSTANCE

ABUSE AND ADDICTION for or on behalf of persons addicted to ORIGINAL OXYCONTIN for

expenditures separate and apart from the health care services and products it paid for as a part of its MEDICAID PROGRAM. This amount, upon information and belief, exceeded the sum of $500 million per year during each year from 2002 to 2010;

B.      the amount of actual damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for the years 2002- 2010 as a part of each such PLAINTIFF'S spending for Medicaid for false claims submitted for payment by PURDUE's Suspect Physicians and Suspect Pharmacy Customers in violation of the MEDICAID MEDICAL NECESSITY STANDARDS (see paragraph 10 supra);

C.      Three times the value of the consideration paid by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for false claims wrongfully submitted for payment to each such PLAINTIFF by PURDUE's Suspect Physicians and Suspect Pharmacy Customers in violation of MEDICAID MEDICAL NECESSITY STANDARDS supra); and

D.      Further, PURDUE should be required to assign to Relator for subsequent assignment by Relator to a federal or private not-for-profit university and/or research facility all of its current patents or licenses to use patents owned by third-parties that relate to its ORIGINAL FORMULATION or REPLACEMENT FORMULATION for possible construction of a tapered-dosage opioid tablet for use by health care providers in the treatment of persons now addicted to heroin and other forms of opioids.

E.      reasonable attorney's fees as authorized by the statute.


COUNT six: REQUEST FOR DAMAGES FROM DEFENDANT DISTRIBUTORS PURSUANT TO MCPA

93.  RELATOR adopts PARAGRAPHS 1-92 as a part of COUNT SIX.

94.  At all times material between 2002 and 2010 each DEFENDANT DISTRIBUTOR

actively solicited and sold and distributed for purposes of sale to physicians and

pharmacies then located within the Commonwealth of Massachusetts and each Other Co-

Plaintiff State vast quantities of its ORGINAL FORMULATION product after it had actual

knowledge that a substantial portion of such sales, particularly sales of its 80 mg tablet, were

being made to Massachusetts and Other Co-Plaintiff State physicians whom PURDUE and each

other DEFENDANT DISTRIBUTOR had earlier identified and placed on its or their list of Suspect

Pharmacy Customers. (See paragraph 41 supra). This data was contained in each DEFENDANT's

INTERNAL SALES DATA and other related information that had been obtained by each

DEFENDANT's sales force and from IMS Health, a third-party information and technical services

company then doing business with each such DEFENDANT. From such DATA and other

information. each DEFENDANT DISTRIBUTOR knew and had reason to know of the actual

prescription patterns followed by each Suspect Pharmacy Customer and therefore knew and

had the opportunity to determine from such DATA and other related information that of its

Suspect Pharmacy Customers were then actively engaged in the illegal prescription and

dispensing of ORIGINAL OXYCONTIN for purposes of illicit non-medical use and diversion to

persons then addicted to opioids or their suppliers.

    95.   During such time each DEFENDANT DISTRIBUTOR as "registrant" knowingly and

with the intent to deceive failed to disclose to the FDA, the DEA or other federal or state public

health or law enforcement agencies located within the Commonwealth of Massachusetts or

elsewhere that it had actual knowledge that several hundred or more of its Suspect Pharmacy

customers were illegally prescribing the ORIGINAL FORMULATION product, particularly the 80

mg tablet, for distribution to addicts or their suppliers. This failure among other things

constitutes a willful and intentional failure on the part of each such DEFENDANT to comply with

the mandatory reporting obligations of 21 C.F.R. section 1301.77. (See n. 8- 10 supra).

96.    During such time each DEFENDANT DISTRIBUTOR knowingly and with the intent to

deceive continued to distribute ORIGINAL FORMULATION to its Suspect Pharmacy Customers

then located within the Commonwealth of Massachusetts and throughout the United States

and its territories even though it then knew or should have known from its INTERNAL SALES

DATA and other related information that a majority of such sales were paid for by Medicaid as a

part of an illegal conspiracy by such Pharmacies to obtain payment by Medicaid through

Submission of false claims in violation of the MEDICAID MEDICAL NECESSITY STANDARDS. (see

paragraph 10 supra).

97.    Such failures by each DEFENDANT DISTRIBUTOR constitute knowing and purposeful

omissions of material information that misled the FDA, the DEA, the OIG and related state

law enforcement and public health authorities in the exercise of their duties to protect the

public from harm arising from the illicit sale and distribution of Class II narcotic drugs to addicts

and their suppliers. Such willful acts should constitute among other things unfair and deceptive

acts or practices in violation of MCPA ch. 93A section 2. As a proximate cause thereof, PURDUE
and each other DEFENDANT DISTRIBUTOR is liable to the UNITED STATES, the

COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE under such statute

for ACTUAL AND PUNITIVE DAMAGES, as follows:

A.   the amount of actual and consequential damages sustained by the UNITED STATES,

the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for years

years 2002 — 2010 as a part of each government's spending on SUBSTANCE ABUSE AND

ADDICTION for or on behalf of persons addicted to ORIGINAL OXYCONTIN for expenditures separate and apart from the health care services and products it paid for as a part of its MEDICAID PROGRAM. This amount, upon information and belief, exceeded the sum of $500 million per year during each year from 2002 to 2010;

B.  the amount of actual damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for the years 2002- 2010 as a part of each government's spending for Medicaid for false claims submitted for payment by the SUSPECT PHARMACY CUSTOMERS in violation of the MEDICAID MEDICAL NECESSITY STANDARDS (see paragraph 10 supra); and

C.  Three times the value of the consideration paid by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for false claims wrongfully submitted for payment to each such government by the SUSPECT PHARMACY CUSTOMERS in violation of such MEDICAID MEDICAL NECESSITY STANDARD), and

D.  reasonable attorney's fees as authorized by the statute.

COUNT SEVEN: REQUEST FOR DAMAGES INCLUDING PUNITIVE DAMAGES FROM PURDUE BASED UPON COMMON LAW FRAUD CLAIMS OF FRAUDULENT CONCEALMENT AND WILLFUL NONDISCLOSURE IN BREACH OF THEIR AFFIRMATIVE DUTY TO DISCLOSE:

98.  RELATOR adopts PARAGRAPHS 1-97 as a part of COUNT SIX.

99.  At all times material between 2002 and 2010 PURDUE and each DEFENDANT DISTRIBUTOR distributed for purposes of sale vast quantities of its ORGINAL FORMULATION product after it had actual knowledge that a substantial portion of such sales, particularly sales of its 80 mg tablet, were being made to physicians whom PURDUE had earlier identified and placed on their list of "Suspect Physicians. (See paragraph 36.A — 36.E supra). This data was

contained in its INTERNAL SALES DATA and other related information that had been obtained by the PURDUE sales force and from IMS Health, a third-party information and technical services company doing business with PURDUE. From such DATA PURDUE knew or had reason to know of the actual prescription patterns followed by each of its prescribing physicians and therefore, knew and had the opportunity to determine from such DATA and other related information that of its prescribing physicians were then actively engaged in the illegal prescription and dispensing of ORIGINAL OXYCONTIN for purposes of illicit non-medical use and diversion to persons then addicted to opioids or their suppliers.

100. During such time PURDUE knowingly and with the intent to deceive failed to disclose to the FDA or other federal or state public health or law enforcement agencies that it had actual knowledge that several hundred or more of its "Suspect Physicians" were "recklessly" and illegally prescribing its ORIGINAL FORMULATION product, particularly the 80 mg tablet, for distribution to addicts or their suppliers. PURDUE continued its deception even after the Commonwealth of Massachusetts and other states obtained CONSENT JUDGEMENTS that required PURDUE to identify and report to governmental officials physicians who PURDUE and its sales force believed were engaged in "atypical patterns of prescribing" as described in the "SEVEN MANDATORY REPORTING CRITERIA" identified in the 2007 Massachusetts Consent Judgment. (See paragraph s 50 - 51 supra). This failure among other things constitute a willful and intentional failure on the part of PURDUE to comply with the reporting and certification requirements of the Corporate Integrity Agreement it signed with OIG in 2007. (See paragraphs 52 — 53 supra).

101. During such time PURDUE as "applicant" knowingly and with the intent to deceive failed to comply with the reporting obligations set forth in 1992 21 CFR 314.80, specifically the "frequency" of illicit abuse and distribution and resulting "serious and unexpected" adverse drug experience that increased to epidemic proportions within five years after it received approval by the FDA of NDA 20 - 553 in 1995 and NDA 20 - 553/S-056 in 1996. (see paragraphs 41. C- 41.D supra).

102.   During such time PURDUE knowingly and with the intent to deceive continued to sell and distribute ORIGINAL FORMULATION to its Suspect Physicians even though it then knew or should have known from its INTERNAL SALES DATA and other related information that a majority of such sales were paid for by Medicaid as a part of an illegal conspiracy by such physicians to obtain payment by Medicaid through submission of false claims in violation of the MEDICAID MEDICAL NECESSITY STANDARDS. (see paragraph 10 supra).

103.   PURDUE's failure to make periodic or annual reporting when due to the FDA, the Commonwealth of Massachusetts, the Office of Inspector General and the DEA and other state and federal agencies constituted numerous and ongoing misrepresentations of material fact, that representations were known by PURDUE to be false when made. Such misrepresentations included PURDUE's failure to comply as "applicant" with 21 C.F.R. section 314.80 (See n. 3 supra) and as "registrant" with 21 C.F.R. section 1301.71. (See n. 6 — 10 supra). Such misrepresentations were relied upon by the FDA, the Commonwealth of Massachusetts, and the Office of Inspector General. Such misrepresentations, when made, constituted willful nondisclosures in violation of PURDUE's obligation to make a full and timely report of material information in conformity to the terms of 21 CFR 314.80 and 21 C.F.R. section 1301.77, the 2007 Massachusetts Consent Judgment and the 2007 Corporate Integrity Agreement.

104.   As a proximate result thereof, PURDUE is liable to the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for actual and punitive damages, as follows:

A.   the amount of actual and consequential damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for the years 2002 — 2010 as a part of its spending on SUBSTANCE ABUSE and ADDICTION, that expenditures are separate and apart from the health care services and products it paid for as a part of its MEDICAID REIMBURSEMENT PROGRAM. This amount, upon information and belief, exceeded the sum of $500 million per year during each year from 2002 to 2010;

B.   the amount of actual damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and each OTHER CO-PLAINTIFF STATE for the years 2002- 2010 for false claims submitted to for payment by PURDUE's Suspect Physicians in violation of MEDICAID MEDICAL NECESSITY STANDARDS (see paragraph 10 supra), and

C.   punitive damages equal to three times the actual damages sustained by the UNITED STATES, the COMMONWEALTH OF MASSACHUSETTS and the OTHER CO-PLAINTIFF STATES during such years.

COUNT EIGHT: REQUEST FOR DAMAGES INCLUDING PUNITIVE DAMAGES BASED UPON COMMON LAW FRAUD CLAIMS OF FRAUDULENT CONCEALMENT AND WILLFUL NONDISCLOSURE IN BREACH OF DEFENDANT DISTRIBUTORS' AFFIRMATIVE DUTY TO DISCLOSE:

105.   RELATOR adopts PARAGRAPHS 1-104 as a part of COUNT SEVEN.

106.   At all times material between 2002 and 2010 each DEFENDANT DISTRIBUTOR as "registrant" distributed for purposes of sale vast quantities of the ORGINAL FORMULATION

product after it had actual knowledge that a substantial portion of such sales, particularly sales

of its 80 mg tablet, were being made to physicians whom PURDUE had earlier identified and

placed on their list of Suspect Physicians. (See paragraph 36 supra). This data was contained in

the INTERNAL SALES DATA and other related information that had been obtained by PURDUE

and each other DEFENDANT DISTRIBUTOR from IMS Health, a third-party information and

technical services company doing business with PURDUE and each other DISTRIBUTOR. From

such DATA each DEFENDANT DISTRIBUTOR knew or had reason to know of the actual

prescription patterns followed by each of its prescribing physician customers and therefore

knew and had the opportunity to determine from such DATA and other related information

that of its Suspect Pharmacy Customers were then actively engaged in the illegal prescription

and dispensing of ORIGINAL OXYCONTIN for purposes of illicit non-medical use and diversion to

persons then addicted to opioids or their suppliers.

107.    During such time each DEFENDANT DISTRIBUTOR as "registrant" knowingly and

with the intent to deceive failed to disclose to the FDA, the DEA or other federal or state

public health or law enforcement agencies that it had actual knowledge that several hundred

or more of its Suspect Pharmacy Customers were illegally prescribing ORIGINAL

FORMULATION product, particularly the 80 mg tablet, for distribution to addicts or their

suppliers.

108.    Each DEFENDANT DISTRIBUTOR'S failure to make periodic or annual

reporting when due to the DEA, the Commonwealth of Massachusetts, and other state and

federal agencies constituted numerous and ongoing misrepresentations of material fact,

that representations were known by such DEFENDANTS to be false when made. Such

misrepresentations included each such DEFENANT's failure to comply as "registrant" with

21

C.F.R. section 1301.71. (See n. 6 —8 supra). Such misrepresentations were relied upon by the

DEA, the Commonwealth of Massachusetts and each other Co-Plaintiff State. Such

misrepresentations, when made, constituted willful nondisclosures in violation of PURDUE's

obligation to make a full and timely report of material information in conformity to the terms of

21 CFR section 1301.77 and the 2007 Massachusetts Consent Judgment.

109. As a proximate result thereof, each DEFENDANT DISTRIBUTOR is liable to the UNITED

STATES, the COMMONWEALTH OF MASSCHUSETTS and each OTHER CO-PLAINTIFF STATE

for actual and punitive damages, as follows:

A.      the amount of actual and consequential damages sustained by the UNITED

STATES, the COMMONWEALTH OF MASSACHUSETTS, each OTHER CO-PLAINTIFF STATE

and each LOCAL GOVERNMENT INTERVENOR for the years 2002 - 2010 as a part of each

PLAINTIFF's spending on SUBSTANCE ABUSE and ADDICTION; that such expenditures are

separate and apart from the health care services and products it paid for as a part of its

MEDICAID REIMBURSEMENT

PROGRAM. This amount, upon information and belief, exceeded the sum of $250 million per year
during each year from 2002 to 2010;

B.      the amount of actual damages sustained by the UNITED STATES, the

COMMONWEALTH OF MASSACHUSETTS, each OTHER CO-PLAINTIFF STATE and each LOCAL

GOVERNMENT INTERVENOR for the years 2002- 2010 for false claims submitted for payment

by PURDUE's Suspect Physicians in violation of MEDICAID MEDICAL NECESSITY STANDARDS

(See paragraph 10 supra), and

C.    punitive damages equal to three times the actual damages sustained by each such

PLAINTIFF during such years.

WHEREFORE RELATOR ON BEHALF OF THE UNITED STATES, THE COMMONWEALTH OF MASSACHUSETTS, EACH OTHER CO-PLAINTIFF STATE, and EACH LOCAL GOVERNMENT PLAINTIFF DEMAND JUDGMENT IN THEIR FAVOR AGAINST DEFENDANT PURDUE and each DEFENDANT DISTRIBUTOR for all damages and injunctive claimed in COUNTS TWO — EIGHT of this COMPLAINT and further requests a ruling in his or their favor on each issue identified in COUNT ONE (requests for declaratory judgment).

RELATOR ON BEHALF OF EACH SUCH PLAINTIFF FURTHER REQUESTS A TRIAL BY JURY IN THIS ACTION PURSUANT TO Rule 38, F.R.Civ.P.

July 31, 2018                              ROBERT E. MANCHESTER, RELATOR
                                          On behalf of the UNITED STATES, THE
                                           COMMONWEALTH OF MASSACHUSEITS,
                                           EACH OTHER CO-PLAINTIFF STATE AND ALL
                                           LOCAL GOVERNMENT INTERVENORS

                                          _____

                              BY:

                                          S/S Francis G. Conrad

                                          _____

                                          FRANCIS G. CONRAD, ESQ.
                                          ATTORNEY FOR RELATOR

Conrad Law Offices
P.O. Box 68
6658 Mountain View Way West
Huletts Landing, New York
12841-0068

(O)5168352287

Fconrad@vermontel.net

APPENDIX A          7/20/18

## ATTACHMENTS TO AMENDED COMPLAINT SUBMITTED PURSUANT TO WRITTEN DISCLOSURE PROVISION OF 31 U.S.C. 3729 et seq

ATTACHMENT # 1: FDA APPROVAL OF PURDUE'S NDA 20 - 553 FOR ORIGINAL FORMULATION
OF OXYCONTIN DATED DECEMBER 12, 1995                    (REFERENCE PAGE ("RP") RPOOI - 0047

ATTACHMENT # 2: FINDINGS OF FACT AND CONCLUSIONS OF LAW IN in re OXYCONTIN
LITIGATION, case NO. 1:04-md-01603 -SHS (referred to as "383 PATENT CASE" in VERMONT
COMPLAINT). Cf. 994 F. supp. 2d 367 (S.D. N.Y. 2014) (aff'd sub nom, In re Purdue Pharma, L.P. v. Epic
Pharma, 811 F. 3d 1345 (Fed. Cir. 2016)                              RP 0048 - 0082

ATTACHMENT # 3: NY TIMES ARTICLE DATED AUGUST 31, 2011 BY LIZEITE ALVAREZ, "FLORIDA
SHUTTING "PILL MILL" CLINICS                              RP0083 - 087

ATTACHMENT # 4: AGREED STATEMENT OF FACTS DATED MAY 7, 2007, FILED BY PARTIES AS
 PART OF PLEA BARGAIN IN UNITED STATES v. PURDUE FREDERICK CO., et al., 494 F. supp. 2d 569 (W.D.
VA. 2009) ("2007 AGREED STATEMENT")                        RP0088-0106

ATTACHMENT # 5: US PATENT no. 5,508,042 (identified in complaint as "042 PATENT'")
                                                        RP0107-0122
AITACHMENT # 6: US PATENT no 8,114,383, B 2 OBTAINED BY GRUNENTHAL GmbH (identified in
 complaint as "383 PATENT'")        RP0123-0137

 ATTACHMENT # 7 FDA APPROVAL LEITER OF PURDUE'S NDA 022272 DATED APRIL 5, 2010 and
RELATED DOCUMENTS                                RP0138-0148

 ATTACHM ENT # 8: US PATENT no. 6,488,963 Bl OBTAINED BY TEXAS BOARD OF REGENTS
(identified in complaint as "963 PATENT'")                  RP0149-0162

ATTACHMENT # 9: PATENT APPLICATION FILED ON DECEMBER 31, 1997 WITH WORLD
INTELLECTUAL PROPERTY ORGANIZATION BY F ZHANG AND JW McGINITY, "PROPERTIES OF
SUSTAINEDRELEASE TABLETS PREPARED BY HOT-MELT EXTRUSION", CITED BY JUDGE STEIN IN '383
PATENT LITIGATION, 994 F. supp. 2d at 421, related articles and DESCRIPTION OF RELATED PATENTS
                                                        RP0163-0208

1

# ATTACHMENT #

10: FDA APPROVAL LEITER DATED APRIL 16, 2013 OF REVISED LABELING FOR REFORMULATED OXYCONTIN TO INCLUDE "ABUSE-DETERRENT PROPERTIES OF THE NEW FORMULATION" AND RELATED DOCUMENTS INCLUDING FDA PRESS RELEASE and EXCEPTS OF DOCUMENTS RELATED TO THAT FILING                    RP0209-0304

ATTACHMENT # 11: COMPLAINT FILED IN US DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK ON APRIL 3, 2014 IN PURDUE PHARMA, L.P. et al. v. TEVA PHARMACEUTICALS USA, INC., DOCKET NO. 1:14 - -02357 -SHS                    RP0305-327

ATTACHMENT # 12: ORDER OF ACCEPTANCE OF PLEA BARGAIN IN UNITED STATES v. PURDUE FREDERICK COMPANY, FILED IN UNITED STATES v. PURDUE FREDERICK CO., 495 F. SUPP. 2d 576 - 578 (W.D.VIRGINIA 2009)                    RP0328-0337

AITACHMENT # 13: REPORT OF NEW YORK ATTORNEY GENERAL, DATED MAY 2011, "INTERNET SYSTEM FOR TRACKING OVER-PRESCRIBING ('I-STOP')" RP0338-0379

ATTACHMENT # 14: EXCERPTS FROM REPORT OF NATIONAL CENTER ON ADDICTION AND SUBSTANCE ABUSE, DATED MAY 2009 ("CASA REPORT")                    RP0380-0416

ATTACHMENT # 15: CONSENT JUDGMENT BETWEEN COMMONWEALTH OF MASSACHUSETTS DATED MAY 8, 2007 and RELATED AGREEMENT BETWEEN PARTIES
RP0417-0463

ATTACHMENT # 16: LA TIMES ARTICLE DATED JULY 10, 2016 BY HARRIET RYAN, LISA GIRION AND scorr GLOVER: "MORE THAN 1 MILLION OXYCONTIN PILLS ENDED UP IN THE HANDS OF CRIMINALS AND ADDICTS. WHAT THE DRUGMAKER KNEW"                    RP0464-0475

ATTACHMENT # 17: LA TIMES ARTICLE DATED AUGUST 11, 2013 BY SCOTT GLOVER AND LIST GIRION: "OXYCONTIN MAKER CLOSELY GUARDS ITS LIST OF SUSPECT DOCTORS"     RP0476-0480

ATTACHMENT # 18: SEPTEMBER 2009 REPORT PREPARED BY US GENERAL ACCOUNT OFFICE (GAO-957), "MEDICAID FRAUD AND ABUSE RELATED TO CONTROLLED SUBSTANCES IDENTIFIED IN SELECTED STATES"                    RP0481-0521

ATTACH M ENT # 19: CORPORATE INTEGRITY AGREEMENT ENTERED INTO ON MAY 8, 2007 BETWEEN PURDUE AND OFFICE OF INSPECTOR GENERAL OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES                    RP0522-0575

ATTACHMENT # 20: JAMA INTERN MED 2015: 175 (6); 978 - 987: "RATES OF OPIOID

2

## ATTACHMENT #

DISPENSING AND OVERDOSE AFTER INTRODUCTION OF ABUSE-DETERRENT EXTENDED-RELEASE
OXYCONDONE AND WITHDRAWAL OF PROPOXYPHENE" AND RELATED ARTICLE     RP0576-0587     21:
NAEC WORKING PAPER NO. 23031 DATED JANUARY 2017: "SUPPLY-SIDE
DRUG POLICY IN THE PRESENCE OF SUBSTITUTES: EVIDENCE FROM THE INTRODUCTION OF ABUSE-
DETERRENT OPIOIDS", at p 324                                          RP0588-0646

ATTACHMENT # 22: SETTLEMENT AGREEMENT FILED BY PARTIES AS PART OF 2009 PLEA
BARGAIN IN UNITED STATES v PURDUE FREDERICK CO (SEE DOCUMENT # 6 SUPRA) ("2007 FEDERAL
SETTLEMENT AGREEMENT").                                              RP0647-0671

d ATTACHMENT # 23: UNITED STATES v PURDUE PHARMA COMPANY, INC., 963 F. supp. 2d 5661
(W.D.VA. 2013)                                                      RP0672-0688

ATTACHMENT # 24: McQUINNES v. COTTER, 591 N.E. 2d 659, 662 (MASS. 1992)
                                                                    RP0689-0699

AITACHMENT # 25: MA REG # 1301 (958                3.020)           RP0700-0702

ATTACHMENT # 26: PACIFIC STANDARD ARTICLE DATED MARCH 4, 2015 BY MIKE MARIAM,
"HOW THE AMERICAN OPIATE EPIDEMIC WAS STARTED BY ONE PHARMACEUTICAL COMPANY"
                                                                    RP0703-0715

ATTACHMENT # 27: UNITED STATES v JACKIE MIZE, et al., 814 F.3d 401, 2016 WL 75440 (6TH
CIR. 2016)                                                          RP0716-0734

ATTACHMENT # 28: STATEMENT OF ROBERT J. MEYER, DIRECTOR OF OFFICE OF DRUG
TEVALUATION Il, re "FDA's ROLE IN PREVENTING PRESCRIPTION DRUG ABUSE", PRESENTED TO U.s. HOUSE
OF REPRESENTATIVE's COMMITTEE OF GOVERNMENTAL REFORM on SEPTEMBER 13, 2005, at pp
285 - 286                                                           RP0735-0741

ATTACHMENT # 29: TABLE 3.1 p 20, 2009 CASA REPORT (SEE Al-r. # 14 SUPRA)
                                                                    RP0742

## ADDENDUM: OTHER DOCUMENTS NOT CITED IN AMENDED
## COMPLAINT:

ATTACHMENT # 30: 2012 US HEALTH AND SERVICES REPORT: "ADDRESSING PRESCRIPTION

# ATTACHMENT #

DRUG ABUSE IN THE UNITED STATES", EXECUTIVE SUMMARY                    RE) 9743-0774

ATTACHMENT # 31: EXECUTIVE SUMMARY OF THE 2016 US SURGEON GENERAL'S REPORT

RP0775-0772

32: PRELIMINARY DISCOVERY REQUESTS TO SERVE ON PURDUE

RP0773-0795

ATTACHMENT # 33: TABLE 3 OF ARTICLE "ADVERSE DRUG SUREILLANCE AND DRUG
WITHDRAWLS IN THE US, 1969 - 2002                    RP0796-0802

AITACHMENT # 34: EXCERPTS FROM 50 FR 7452: SUMMARY OF REVISED FDA REGULATIONS
APPLICABLE TO NEW DRUG APPLICATION PROCESS AND POSTMARKETING SURVEILLANCE OF ADVERSE
DRUG EXPERIENCES DESCRIBED IN 21 CFR 314.80.c                    RP0803-0809

ATTACHM ENT # 35: JULY 18, 2005 PHARMACY NEWS ARTICLE: "PALLADONE OFF MARKET AT
FDA's REQUEST"                    RP00810-0815

ATTACHMENT # 36: ARTICLE PUBLISHED BY RYAN IN JAN 10 2017 NATION/WORLD: "STUDY:
ATTEMPT TO CURB OXYCONTIN ABUSE AIDED HEROIN'S RESURGENCE" AND RELATED ARTICLES

RP0816-0829

ATTACHMENT #37: LETTER TO EDITOR SUBMITTED TO NEW ENGAND JOURNAL OF MEDICINE
AND PUBLISHED IN NEJM 2012: 367, 187 - 189 JUL 12 2012; AUTHOR THEODORE J. CICERO, PhD
(CICERO IDENTIFIED IN ATT. # 17 LA TIMES ARTICLE)                    RP0830-0831

ATTACH MENT # 38: BOSTON GLOBE STAFF ARTICLE: "MASS HAD HIGHEST RATE OF OPIOID-
RELATED ER VISITS:                    RP0832-0842

ATTACHMENT # 39: DECEMBER 19 2016 ORDER SIGNED BY JUDGE WOLF IN UNITED STATES ex rel
MANCHESTER v PRUDUE docket no 16 - 10947- MLW        RP0843-0844

ATTACHMENT # 40: NOTICE OF US AND DECLINING STATES NOTTO INTERVENE DATED NOV 21,
2016 AND NOTICE OF COMMONWEALTH OF MASSACHUSETTS OF ITS ELECTION NOT TO INTERVENE
DATED NOV 29 2016                    RP0845-0854

ATTACHMENT # 41: OCTOBER 30, 2017 LEITER FROM MANCHESTER TO STATE ATTORNEY
GENERALS OF EACH CO-PLAINTIFF                    RP0855-0859

4

# ATTACHMENT #

ATTACHMENT # 42: OCTOBER 30, 2017 LETTER FROM MANCHESTER TO US ATTORNEY GENERAL
SESSIONS                                                                    RP0860-0877

5